# EXHIBIT A

Westlaw.

2007 WL 582555
--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)
**(Cite as: 2007 WL 582555 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Mark LEVY, Plaintiff,
v.
STERLING HOLDING COMPANY, LLC, National
Semiconductor Corporation and Fairchild
Semiconductor International, Inc, Defendants.
**No. 00-994.**

Feb. 13, 2007.

**Background:** Shareholder brought derivative action on behalf of corporation against two of its directors, alleging that directors's conduct in purchasing corporation's stocks and then selling those stocks at a profit within six months after purchase violated Securities and Exchange Act's prohibition on short-swing profits due to insider trading. Parties cross-moved for summary judgment.

**Holdings:** The District Court, Sleet, J., held that:
(1) Securities and Exchange Commission's (SEC) rules which clarified conditions that applied to exemption from Securities and Exchange Act section which prohibited an insider's speculative short-term trading based upon insider information were permissible readings of the section, and, thus, were entitled to deference, and
(2) amendments to the SEC's rules were not substantive changes in the law, and thus were not retroactively applicable.
Shareholder's motion denied, and directors' motions granted.

**[1] Securities Regulation** ⊂⟶0

349Bk0 k.
Purpose of the Securities and Exchange Act's prohibition on an insider's speculative short-term trading based upon insider information is to prevent corporate insiders from exploiting material information about the issuer to have an advantage over others with whom they trade. Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b).

**[2] Statutes** ⊂⟶0
361k0 k.
When reviewing an agency's actions, the court must first determine whether the statute directly speaks to the precise question at issue, and if not, then the question for the court is whether the agency's interpretation is based on a permissible construction of the statute, but if the court finds that it is, it must give deference to that interpretation.

**[3] Statutes** ⊂⟶0
361k0 k.
A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.

**[4] Statutes** ⊂⟶0
361k0 k.
A judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.

**[5] Securities Regulation** ⊂⟶0
349Bk0 k.
Congress explicitly afforded the Securities and Exchange Commission (SEC) the authority to exempt transactions from the reach of Securities and Exchange Act section which forbids an insider's speculative short-term trading based upon insider information, and, thus, the section does not unambiguously foreclose the SEC's interpretation, but, rather, requires the SEC to interpret which transactions are exempt from its application. Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b).

**[6] Securities Regulation** ⊂⟶0
349Bk0 k.
Securities and Exchange Commission's (SEC) rules which clarified conditions that applied to exemption

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 582555                                                    Page 2
--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)
**(Cite as: 2007 WL 582555 (D.Del.))**

from Securities and Exchange Act section which pro-hibited an insider's speculative short-term trading based upon insider information were permissible readings of the section, and, thus, were entitled to de-ference, where rules reiterated purpose behind the section, and bore a fair relationship to language of the section. Securities Exchange Act of 1934, § 16(b), <u>15 U.S.C.A. § 78p(b)</u>; <u>17 C.F.R. §§ 240.16b-3</u>, <u>240.16b-7</u>.

**[7] Securities Regulation** 〰0
<u>349Bk0</u> k.
Amendments to Securities and Exchange Commis-sion's (SEC) rules which clarified conditions that ap-plied to exemption from Securities and Exchange Act section which prohibited an insider's speculative short-term trading based upon insider information were not substantive changes in the law, and thus were not retroactively applicable, where amendments did not change the legal landscape with respect to ex-emptions under the section, but, rather, were consist-ent with the SEC's previously-stated positions. Secur-ities Exchange Act of 1934, § 16(b), <u>15 U.S.C.A. § 78p(b)</u>; <u>17 C.F.R. §§ 240.16b-3</u>, <u>240.16b-7</u>.

**[8] Statutes** 〰0
<u>361k0</u> k.
Retroactivity of a statute is not favored in the law.

**[9] Statutes** 〰0
<u>361k0</u> k.
Congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.

**[10] Statutes** 〰0
<u>361k0</u> k.
Not every change in an administrative rule effects such a change that it will be considered as operating retroactively.

**[11] Statutes** 〰0
<u>361k0</u> k.
In determining whether a statute is retroactively ap-plicable, the court must determine whether the statute takes away or impairs vested rights acquired under the existing laws, or creates a new obligation, im-poses a new duty, or attaches a new disability, in re-

spect to transactions or considerations already past.

**[12] Statutes** 〰0
<u>361k0</u> k.
In determining whether a statute is retroactively ap-plicable, the court must consider more than the mere fact that a change or amendment has occurred; it must also consider the nature and extent of the change in the law.

**[13] Statutes** 〰0
<u>361k0</u> k.
For purposes of determining whether a statute is ret-roactively applicable, the strongest indication of a substantive change is inconsistency with a previously stated position.

**[14] Statutes** 〰0
<u>361k0</u> k.
For purposes of determining whether a statute is ret-roactively applicable, a change in the text of a regula-tion does not necessarily denote a substantive change.

**[15] Securities Regulation** 〰0
<u>349Bk0</u> k.
The elements of a claim under Securities and Ex-change Act section which prohibits an insider's spec-ulative short-term trading based upon insider inform-ation are that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period. Securities Exchange Act of 1934, § 16(b), <u>15 U.S.C.A. § 78p(b)</u>.

<u>Jeffrey S. Goddess</u>, Esquire, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, <u>Jeffrey S. Abra-ham</u>, Esquire, <u>Mitchell M.Z. Twersky</u>, Esquire, and <u>David Weinberger</u>, Esquire, of Abraham, Fruchter & Twersky, LLP, New York, NY, for Plaintiff.

<u>P. Clarkson Collins, Jr.</u>, Esquire, of Morris, James, Hitchens & Williams, LLP, <u>Jeffrey L. Moyer</u>, Es-quire, of Richards, Layton & Finger, P.A., Wilming-ton, <u>Steven B. Feirson</u>, Esquire, and <u>Carolyn H. Feeney</u>, Esquire, of Dechert LLP, Philadelphia, Pennsylvania, and <u>Paul Vizcarrondo, Jr.</u>, Esquire, <u>Mi-chael A. Charish</u>, Esquire, <u>Michael S. Winograd</u>, Es-quire, of Wachtell, Lipton, Rosen & Katz, New York,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)
**(Cite as: 2007 WL 582555 (D.Del.))**

NY, for Defendants.

OPINION

SLEET, District J.

I. INTRODUCTION

*1 On November 28, 2000, the plaintiff Mark Levy
("Levy") filed this shareholder's derivative suit on be-
half of the defendant Fairchild Semiconductor
("Fairchild") after making an appropriate demand to
the board. The complaint alleges that defendants Na-
tional Semiconductor ("National") and Sterling Hold-
ing Company ("Sterling") (collectively, the "defend-
ants"), who sit on the Fairchild Board of Directors,
purchased Fairchild stocks and then sold those stocks
at a profit within six months after purchase. Levy fur-
ther alleges that National and Sterling's conduct viol-
ated the prohibition on short-swing profits due to in-
sider trading expressed in section 16(b) of the Secur-
ities and Exchange Act of 1934 (the "Act"). *See* 15
U.S.C. § 78p(b).

Presently before the court are Levy's, National's, and
Sterling's cross-motions for summary judgment, pur-
suant to Federal Rule of Civil Procedure 56(c). For
the reasons that follow, the court will grant National's
and Sterling's motions for summary judgment and
deny Levy's motion for summary judgment.

II. BACKGROUND

A. Factual Background

National and Sterling are both incorporated in the
State of Delaware. On March 11, 1997, Fairchild was
spun off from National pursuant to an Agreement and
Plan of Recapitalization (the "Agreement"). The
newly-created Fairchild issued three classes of stock
to its original equity investors, i.e. National, certain
members of Fairchild's management, and Sterling: (1)
preferred stock, valued at $1,000 per share with a cu-
mulative dividend rate of 12%; (2) class A common
stock, which had voting powers and was valued at
$0.50 per share; and (3) class B common stock,
which did not have voting powers and was valued at
$0.50 per share. The class A common stock and class
B common stock were freely convertible into each
other at the election of the shareholder.

The Agreement permitted National and Sterling to re-
tain or purchase stock in Fairchild. At that time, Na-
tional retained 4,380,000 shares of class A common
stock, 5,243,621 shares of class B common stock
(after a four-for-one common stock split, which oc-
curred in April 1998), and 11,667 shares of 12%
series A cumulative compounding preferred stock.
Sterling exercised its rights under the Agreement and
purchased, for $58.5 million, approximately
3,553,000 shares of class A common stock,
7,099,000 shares of class B common stock (again,
after the April 1998 split), and 53,113 shares of the
preferred stock.

In May 1999, Fairchild decided to go public through
an initial public offering ("IPO"). When Fairchild in-
terviewed potential underwriters, each of them took
the position that Fairchild needed to eliminate its pre-
ferred stock in order to accomplish an IPO. In other
words, Fairchild was informed that it should undergo
a recapitalization in anticipation of its IPO. The re-
capitalization contemplated that preferred shares
would be converted to common stock. Fairchild's cer-
tificate of incorporation, however, did not provide for
the conversion of preferred stock into common stock.
Accordingly, on July 1, 1999, a majority of
Fairchild's common and preferred shareholders voted
to convert all shares of preferred stock into class A
common stock "automatically" upon completion of
the IPO. The certificate of incorporation was
amended to reflect the reclassification, and also set
out a formula for the conversion of the shares. [FN1]
According to the formula, each share of Fairchild's
preferred stock was worth 75.714571 shares of class
A common stock. As a result, Sterling acquired
4,021,428 shares and National acquired 888,362
shares of common stock in exchange for their pre-
ferred stock. These acquisitions occurred on August
9, 1999, the date the IPO was completed. According
to the prospectus filed by Fairchild on August 4,
1999, National was the beneficial owner of 14 .8% of
class A common stock and 14.9% of class B common
stock. The prospectus also disclosed that, by 1999,
Sterling was the beneficial owner of 48.0% of the
class A common stock and 85.1% of the class B com-
mon stock. [FN2] Thus, both National and Sterling
had stock ownership in Fairchild exceeding ten per-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cent.

**\*2** In late 1999, Fairchild planned a follow-on or secondary offering of its common stock. In accordance with Fairchild's plan, on January 19, 2000 (with a closing date of January 25, 2000), Sterling sold 11,115,000 shares of class A common stock and National sold 7,243,360 shares of class A common stock in the secondary offering for profits of $58,511,777.00 and $14,124,958.00, respectively. Both sales were within six months of the time National and Sterling acquired the new shares of common stock.

B. Procedural Background

On November 28, 2000, Levy filed this shareholder's derivative suit against National and Sterling. On January 29, 2001, National and Sterling moved to dismiss the complaint pursuant to <u>Federal Rule of Civil Procedure 12(b)(6)</u>. On February 5, 2002, the court issued a Memorandum and Order granting the motion to dismiss and holding that Rule 16b-7 exempted the reclassification transaction at issue. (D.I.46.) Levy appealed the court's decision to the Court of Appeals for the Third Circuit. On December 13, 2002, the Third Circuit issued an opinion in the matter, reversing this court's decision and holding, under its interpretation of Rule 16b-7, that it could not conclude at the motion to dismiss stage that Rule 16b-7 exempted the reclassification. See <u>Levy v. Sterling Holding Co., 314 F.3d 106, 125 (3d Cir.2002)</u>. The Third Circuit also held that, under its interpretation of Rule 16b-3(d), the exemption afforded could not apply to the reclassification at issue unless the transaction had some connection to a compensation-related function. <u>Id. at 124.</u>

National and Sterling subsequently petitioned the Third Circuit for rehearing or rehearing *en banc* on the issue. The Securities and Exchange Commission (the "SEC") joined the petition and filed an *amicus* brief, which urged the court to vacate its opinion. On April 30, 2003, the Third Circuit denied the petition for rehearing or rehearing *en banc*. National and Sterling filed a writ of certiorari with the Supreme Court, which the Court denied on October 14, 2003. See <u>Sterling Holding Co. v. Levy, 540 U.S. 947, 124 S.Ct.</u>

<u>389, 157 L.Ed.2d 277 (2003)</u>.

On June 4, 2004, the parties filed the cross-motions for summary judgment that are presently at issue. On June 21, 2004, the SEC disseminated a release titled <u>*Proposed Rule: Ownership Reports and Trading by Officers, Directors and Principal Security Holders,* Release Nos. 34-49895; 35-27861; IC-26471, 69 Fed.Reg. 35,982</u> (the "Proposed Amendments") in an effort to amend Rules 16b-3(d) and 16b-7. On June 25, 2004, National and Sterling filed a motion to stay the proceedings pending final action by the SEC on the Proposed Amendments to SEC Rules 16b-3 and 16b-7. The court issued an Order (D.I.223) on September 27, 2004, granting the motion and staying the proceedings. On August 3, 2005, the SEC adopted the Proposed Amendments. See Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-52202, 70 Fed.Reg. 46,080 (Aug. 9, 2005) (the "Amendments").

**\*3** On August 11, 2005, the court issued an Order (D.I.236) lifting the stay and directing the parties to file briefing with respect to two issues: (1) whether the Amendments are entitled to deference; and (2) whether the court should apply the Amendments retroactively to the reclassification at issue in the context of resolving the parties' competing summary judgment motions. The court heard oral argument regarding the two issues on November 1, 2005 and took the matter under advisement.

III. STANDARD OF REVIEW

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Fed.R.Civ.P. 56(c)</u>; <u>Biener v. Calio, 361 F.3d 206 (3d Cir.2004)</u>. In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. See <u>Whiteland Woods, L.P. v. Twp. of West Whiteland, 193 F.3d 177, 180 (3d Cir.1999)</u>. Thus, a trial court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)._

If a moving party has demonstrated the absence of a genuine issue of material fact--meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole--concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." _Liberty Lobby, 477 U.S. at 256-57_ (citation omitted). Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not "genuine." _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)._

## IV. DISCUSSION

Before the court can consider the parties' cross-motions for summary judgment, it must determine whether it owes deference to the SEC's interpretation of Rules 16b-3 and 16b-7. Additionally, the court must determine whether the Amendments apply to the reclassification at issue in the present case.

A. Whether the Amendments are Permissible Readings of Section 16(b)

The SEC amended Rules 16b-3 and 16b-7 in 2005 to "resolve any doubt as to the meaning and interpretation of these rules [16b-3 and 16b-7] by reaffirming the views [it has] consistently expressed previously regarding their appropriate construction." _70 Fed.Reg. 46,080, 46,080 (Aug. 9, 2005)._ Specifically, with respect to Rule 16b-3(d), the SEC noted that the amendment was necessary "to eliminate the uncertainty generated by the _Levy v. Sterling_ opinion," and to reassure insiders and issuers that noncompensatory acquisitions are included within the

scope of Rule 16b-3's exemption. [FN3] _Id._ at 46,082; _see id._ at 46,083 (exempting "any transaction ... involving an acquisition by an officer or director from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose"). Further, the SEC concluded that, because Rule 16b-3(d) "clarif[ies] regulatory conditions that applied to the[ ] exemptions since they became effective on August 15, 1996, [it is] available to any transaction on or after August 15, 1996 that satisfies the regulatory conditions so clarified." _Id._ at 46,080.

*4 With respect to Rule 16b-7, the SEC stated that the _Levy_ opinion "imposed upon reclassifications exemptive conditions that are not found in the language of [the rule,] and would not apply to a merger or consolidation relying upon the rule." _70 Fed.Reg. 46,080, 46, 084._ Thus, the SEC proposed to amend Rule 16b-7 "to eliminate uncertainty generated by the _Levy v. Sterling_ opinion," and to specify that that the rule applies to reclassifications on the same basis as mergers and consolidations. [FN4] _Id._ at 46,084-85. In addition, the SEC concluded that, because Rule 16b-7 "clarifies regulatory conditions that applied to th[e] exemption since it was amended effective May 1, 1991, it is available to any transaction on or after May 1, 1991 that satisfies the regulatory conditions so clarified." _Id._ at 46,080.

Here, the defendants contend that because the Amendments do not change the law but, rather, clarify what it was before, they apply to the reclassification at issue in this case. (D.I. 242, at 5.) To support their proposition, the defendants cite a number of cases, as well as the SEC's own language in the Amendments' adopting release, which refers to them as "clarify[ing]," and explains that they apply to any transaction occurring on or after the dates that the pre-amendment versions of the rules were adopted. (See Id. at 7-9.) Conversely, Levy contends that "the [SEC's] views as to whether its rules are legislative or interpretive are not entitled to deference" and, regardless of how labeled, the Amendments cannot be applied retroactively. (D.I. 239, at 4, 9.) Here, if the defendants are correct, and the Amendments apply to any transaction occurring after the Rules' effective dates, then the transactions at issue are exempt from

section 16(b). The court, therefore, must determine whether the Amendments "establish[ ] an interpretation that 'changes the legal landscape.' " *Nat'l Mining Ass'n v. Dep't of Labor,* 292 F.3d 849, 859 (D.C.Cir.2002) (citing cases); *see also Princess Cruises, Inc. v. United States,* 297 F.3d 1358, 1363 (Fed.Cir.2005). However, prior to making that determination, the court must consider whether Congress has authorized the SEC to exempt the insider short-swing transactions at issue from section 16(b) liability and, if so, whether the SEC's interpretation of its own rules is a permissible reading of section 16(b).

[1] Section 16(b) of the Act imposes liability for "short-swing"profits-- that is--it forbids an insider's speculative short-term trading based upon insider information. "Its purpose is to prevent corporate insiders from exploiting material information about the issuer to have an advantage over others with whom they trade." *Bruh v. Bessemer Venture Partners III L.P.,* No. 03 Civ. 7340(GBD), 2005 WL 2087803, at * 3 (S.D.N.Y. Aug.29, 2005) (citing *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir.1998)). Section 16(b) provides, in pertinent part:

> *5 For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of the issuer ... within a period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction.... *This subsection shall not be construed to cover ... any transaction or transactions which the [SEC] by rules and regulations may exempt as not comprehended within the purpose of this subsection.*

15 U.S.C. § 78p(b) (2004) (emphasis added). Accordingly, the text of section 16(b) demonstrates that Congress gave the SEC broad authority, which includes the authority to promulgate binding legal rules to exempt certain insider transactions from section 16(b)'s reach. In view of this broad authority, the court will apply the analysis set forth in *Chevron*

*U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) to the SEC's interpretation of its rules exempting transactions from section 16(b).

[2] In *Chevron,* the Supreme Court espoused a two-step framework for courts to follow when reviewing an agency's actions. The court must first determine "whether Congress has directly spoken to the precise question at issue." *Appalachian States Low-Level Radioactive Waste Commission v. O'Leary,* 93 F.3d 103, 108 (3d Cir.1996) (citing *Chevron,* 467 U.S. at 842-43). If the court's answer is "no," meaning that Congress has not directly spoken to the issue, then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Appalachian States,* 93 F.3d at 108 (citation omitted). If the court finds that it is, it must give deference to that interpretation. "If Congress 'explicitly left a gap for an agency to fill ... a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.' " [FN5] *Robert Wood Johnson Univ. Hosp. v. Thompson,* 297 F.3d 273, 281 (3d Cir.2002).

[3][4] Moreover, "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." Nat'l Cable & Telecomm. Assoc. v. Brand X Internet Servs.,* 545 U.S. 967, 982, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (emphasis added). This is because "*Chevron* established a 'presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." ' *Id.* (citing *Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 740-41, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996)). Therefore, "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Brand X,* 545 U.S. at 982-83.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 582555                                                                                    Page 7
--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)
**(Cite as: 2007 WL 582555 (D.Del.))**

*6 [5] Here, as previously mentioned, Congress explicitly afforded the SEC the authority to exempt transactions from the reach of section 16(b). Therefore, section 16(b) does not unambiguously foreclose the SEC's interpretation but, rather, requires the SEC to interpret which transactions are exempt from its application. *See Levy,* 314 F.3d at 112 ("As we have indicated, section 16(b) explicitly authorizes the SEC to exempt 'any transaction ... as not comprehended within the purpose' of the statute. This section is critical, for courts defer to an agency's interpretation of statutes, particularly where the statute provides the agency with authority to make the interpretation.") In other words, Congress did not speak to the precise question at issue, but explicitly left a gap for the SEC to fill. The SEC filled this gap by promulgating rules exempting certain transactions. As the Third Circuit noted in *Levy,* however, "the SEC [rules did] not set forth [the SEC's] interpretation [of section 16(b) ] clearly." *Id.* Thus, the court endeavored to determine the proper interpretation of those rules. Noteworthy, however, is the fact that the Third Circuit did not hold that its interpretation of the SEC Rules was derived from the unambiguous language of either section 16(b) or Rules 16b-3 and 16b-7. [FN6] In response to the Third Circuit's criticism of its lack of clarity in the interpretation of section 16(b), the SEC released the Amendments to "resolve any doubt as to the meaning and interpretation of these rules [Rules 16b-3 and 16b-7]." 70 Fed.Reg. 46,080, 46,081. Accordingly, because the Third Circuit did not conclude that section 16(b) unambiguously foreclosed the SEC's interpretation as set forth in the Amendments, its ruling in the *Levy* case does not displace that interpretation. The court, therefore, must apply the second prong of the *Chevron* analysis to determine whether the Amendments are based on a permissible construction of section 16(b).

[6] Here, the legislative history and purpose of the statute support the SEC's interpretations set forth in the Amendments. The clear aim of the section was "the general evil of officers and directors rigging their stock up and down squeezing out their own stockholders ." Interpretive Release on Rules Applicable to Insider Reporting and Trading, Release No. 34-18114, 46 Fed.Reg. 48,147 (Sept. 24, 1981)

(quoting Stock Exchange Practices, Report of the Committee on Banking and Currency, S.Rep. No. 1455, 73rd Cong., 1st Sess., pt. 15, at 6559 (1934)). In *Levy,* the Third Circuit noted that the Supreme Court has also explained the purpose of section 16(b):

> The general purpose of Congress in enacting s[ection] 16(b) is well known.... Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors. In s[ection] 16(b) Congress sought to 'curb the evils of insider trading (by) ... taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great.' ... It accomplished this by defining directors, officers, and beneficial owners as those presumed to have access to inside information and enacting a flat rule that a corporation could recover the profits these insiders made on a pair of security transactions within six months.

*7 314 F.3d at 110 (quoting *Foremost-McKesson, Inc. v. Provident Sec. Co.,* 423 U.S. 232, 243-44, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976)). [FN7] Based on the Senate Committee's observations and the Supreme Court's explanation, the court finds that the central purpose behind section 16(b) was to curb insider trading, which "is rooted in inequality of information between persons who are aware of it and the persons they transact with." 70 Fed.Reg. 46,080, 46083. Stated another way, the unfair use of information that Congress desired section 16(b) to remedy was the use of information known by officers and directors, but not by investors, to the disadvantage of uninformed investors.

As the SEC explains in both the adopting release to the 1996 amendment to Rule 16b-3 and the current Amendments, the inequality of information that section 16(b) was designed to remedy "generally does not exist when an officer or director acquires securities from, or disposes of them to, the issuer." 70 Fed.Reg. 46,080, 46,083; *see* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-37260, 61 Fed.Reg. 30,376, 30,377 (June 14, 1996). Indeed, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 amendment focused on the distinction between issuer and officer/director transactions, and market transactions by officers and directors, explaining that "where the issuer, rather than the trading markets, is on the other side of an officer or director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed shareholders and other market participants of the type contemplated by the statute." 61 Fed.Reg. 30,376, 30,377. The SEC then concluded that its experience with section 16 "persuaded [it] that transactions between the issuer and its officers and directors that are pursuant to plans ... that satisfy ... objective gate-keeping conditions are not vehicles for the speculative abuse that section 16(b) was designed to prevent," and exempted those transactions under Rule 16b-3. *Id.* After exempting transactions between an issuer and its officers and directors, the SEC explained that transactions with issuer-sponsored employee benefit plans would be treated as issuer to officer/director transactions and, further, that they "need not be pursuant to an employee benefit plan or any compensatory program to be exempt, nor need [they] specifically have a compensatory element." *Id.* at 30,378-79. The SEC made these revisions to Rule 16b-3 in 1996, in order "to align better the regulatory requirements under the rule with the statutory goals underlying section 16," and intended them, in part, "to streamline the section 16 regulatory scheme, particularly with respect to transactions between an issuer and its officers and directors ... [and] broaden exemptions from short-swing profit recovery where consistent with the statutory purpose." 61 Fed.Reg. 30,376, 30,376, 30,380.

The Amendment to Rule 16b-3 reiterates the purpose behind and legislative contemplation that went into section 16(b). 70 Fed.Reg. 46,080, 46,081-82. More important, however, is the fact that the Amendment reaffirms the SEC's earlier conclusion that transactions between an issuer and its officers and directors are not the type of "insider" transactions contemplated by section 16(b), and need not have a compensatory element to qualify for exemption under Rule 16b-3(d). *Id.* at 46,083.

**\*8** The SEC also has interpreted that reclassifications fall outside the evils that section 16(b) was designed to protect against. In 1981, the SEC issued a release

in which it interpreted its rules under section 16(b). *See* Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 34-18114, 46 Fed.Reg. 48,147 (Oct. 1, 1981). The SEC issued the interpretive release because it had been receiving a number of similar questions regarding the provisions of the rules promulgated under section 16. *See id.* at 48,147. In the release, the SEC states that the exemption under Rule 16b-7 "is based on the premise that [the exempted] transactions are of relatively minor importance to the stockholders of a particular company and do not present significant opportunities to insiders to profit by advance information...." *Id.* at 48,176. One of the questions that the SEC addressed in the release was whether Rule 16b-7 applied to reclassifications, even though they weren't specifically mentioned in the text of the rule. *Id.* at 48,176-77 (Question 142). It concluded that, because Rule 16b-7 "does not require that the security received in exchange be similar to that surrendered," it "can apply to transactions involving reclassifications." *Id.* at 48,177.

In 1991, the SEC made revisions to Rule 16b-7, adding the word "reclassifications" to the title of the rule, but explaining that the amendment was not intended to make any substantive change. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-28869, 56 Fed.Reg. 7242, 7262-63, 7273 (Feb. 21, 1991). In 2002, the SEC expressly stated that corporate reclassifications were exempt from 16(b) liability under Rule 16b-7. *See* Form 8-k Disclosure of Certain Management Transactions, Release Nos. 33-8090, 34-45742, 67 Fed.Reg. 19,914, 11,919 n. 56 ("These [acquisitions or dispositions pursuant to holding company formations and similar corporate reclassifications and consolidations] are the transactions exempted from section 16(b) short-swing profit recovery by Exchange Act Rule 16b-7.")

The current Amendment to Rule 16b-7 reaffirms the SEC's prior position on reclassifications, as voiced in the 1981, 1991, and 2002 releases. The Amendment also notes that, similar to a merger exempted by the rule, a reclassification "effects no major change in the issuer's business or assets." 70 Fed.Reg. 46,080, 46,084 (illustrating that reclassifications are similar

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 582555                                                                                          Page 9
--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)
(Cite as: 2007 WL 582555 (D.Del.))

to mergers exempted by Rule 16b-7, in that an issuer "could effect a reclassification by forming a wholly-owned 'shell' subsidiary, merging the issuer into the subsidiary, and exchanging securities for the issuer's securities"). Finally, the Amendment reaffirms that reclassifications, "which do not involve a substantial change in the business owned, do not involve the holders' payment of consideration in addition to the reclassified class or series of securities, and have the same effect on all holders of the reclassified class or series, do not present insiders the significant opportunities to profit by advance information that [s]ection 16(b) was designed to address." 70 Fed.Reg. 46,080, 46,085.

*9 Given the foregoing analysis, the court finds that the Amendments are permissible readings of the statute and further concludes that they 'bear[ ] a fair relationship to the language of the statute, reflect[ ] the views of those who sought its enactment, and match[ ] the purpose they articulated." *Appalachian States,* 93 F.3d at 110. As such, this court may not substitute its judgment for the SEC's judgment. Therefore, the only issues remaining for the court to determine are whether the amended or pre-amendment Rules 16b-3 and 16b-7 apply to the transactions at issue in the present case, which occurred in 1999 and 2000, and whether any party is entitled to summary judgment.

B. Retroactivity

[7][8][9][10][11][12][13] Levy contends that even if the court labels the Amendments interpretive rules, applying them to the case at bar is impermissible under the retroactivity doctrine. (See D.I. 247, at 10 .) "Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Thus, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* However, not every change in an administrative rule effects such a change that it will be considered as operating retroactively. The Supreme Court has stated in *Landgraf v. USA Film Products* that:

[a] statute [or rule] does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's [or rule's] en-

actment ... or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.

511 U.S. 244, 269-70 (1994) (internal citations and footnote omitted). Following this pronounced standard, the court must determine whether the Amendments "take[ ] away or impair[ ] vested rights acquired under the existing laws, or create[ ] a new obligation, impose[ ] a new duty, or attach[ ] a new disability, in respect to transactions or considerations already past." *Princess Cruises, Inc. v. United States,* 397 F.3d 1358, 1362 (Fed.Cir.2005). Put another way, the court must consider more than the mere fact that a change or amendment has occurred--it must also consider "the nature and extent of the change in the law." *Id.* at 1363 (citing *Landgraf,* 511 U.S. at 270). "The strongest indication of a substantive change is inconsistency with a previously stated position." *First Nat'l Bank of Chicago v. Standard Bank & Trust,* 172 F.3d 472, 479 (7th Cir.1999).

The Amendment to Rule 16b-3(d) is now titled "Acquisitions from the issuer," and adds the words "whether or not intended for a compensatory or other particular purpose." [FN8] 17 C.F.R. § 240.16b-3 (2005). The Amendment to Rule 16b-7 adds the word "reclassification" to the terms merger or consolidation that appear in the pre-amendment version of the rule. 17 C.F.R. 240.16b-7 (2005). It also adds the phrase "[t]he exemption provided by [this section] applies to any securities transaction that satisfies the conditions specified in this section and is not conditioned on the transaction satisfying any other conditions." [FN9] 17 C.F.R. 240.16b-7. As previously noted, the SEC made these revisions to remove any doubt as to the nature and scope of transactions exempted from section 16(b) short-swing profit recovery by Rules 16b-3 and 16b-7. 70 Fed.Reg. 46,080, 46,081. Levy argues that even though the SEC refers to the Amendments as clarifying, they are not clarifying but, instead, legislative rules effecting substantive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

changes in the law. (D.I. 239, at 4-5.) An examination of the SEC's previously stated position, however, reveals that it is consistent with the Amendments. In other words, the Amendments do not change the legal landscape with respect to exemptions under section 16(b). The SEC's position appears in the previously-discussed adopting releases to Rules 16b-3 and 16b-7, as well as several persuasive no-action letters authored by SEC staff, which the court now addresses.

*10 On January 12, 1999, the SEC issued a No-Action Letter to Skadden, Arps, Slate, Meagher & Flom LLP (the "Skadden Letter") regarding the application of Rule 16b-3 to transactions occurring in the context of corporate mergers. *See* Skadden, Arps, Meagher & Flom LLP, SEC No-Action Letter, 1999 WL 11540 (Jan. 12, 1999). In this letter, the SEC interpreted Rule 16b-3(d) to exempt "the acquisition of acquiror equity securities (including acquiror derivative securities) by officers and directors of the acquiror through the conversion of target equity securities in connection with a merger." *Id.* at *1. The transaction described in the letter is a transaction outside of the compensatory context, and one that the SEC concluded would be exempt under Rule 16b-3(d). Accordingly, the Skadden Letter provides persuasive support for the defendants' position that the Amendments effected no change in the application of Rule 16b-3. [FN10]

Similarly, the SEC's No-Action Letters to Monk-Austin, Inc. ("Monk-Austin") and St. Charles Acquisition Limited Partnership ("St.Charles") demonstrate that the SEC had interpreted Rule 16b-7 to apply to reclassifications. *See* Monk-Austin, Inc., No-Action Letter, 1992 WL 337451 (Nov. 19, 1992); St. Charles Acquisition Ltd. P'ship, No-Action Letter, 1992 WL 146565 (June 25, 1992). In the Monk-Austin letter, the company seeking the SEC's advice planned to effect a recapitalization in which a new class of common stock would be created, and all outstanding shares of capital stock would be converted into shares of common stock. *Monk-Austin, 1992 WL 337451, at *1.* Monk-Austin asked the SEC to concur in its view that the receipt of common stock in the recapitalization would be exempt under Rule 16b-7. *Id.* at * 2. Monk-Austin set forth its understanding of the types

of transactions that Rule 16b-7 exempts:

> The Staff has long recognized that Rule 16b-7, which exempts mergers and other transactions in which securities received in the transaction are issued by a company that owned 85% of all other companies involved in the transaction, is designed to exempt transactions that are subject to little abuse by insiders and "do not significantly alter in an economic sense the type of security which the insider held prior to the transaction." In the [September 23,] 1981[SEC] Release, the Staff took the position that Rule 16b-7 could apply to transactions structured as reclassifications if all other conditions of the rule were satisfied.

*Id.* at * 3 (citations omitted). Monk-Austin then posited that "[t]he acquisition by the Company's shareholders of shares of Common Stock should be exempt from Section 16(b) by virtue of Rule 16b-7," because "the recapitalization is effected to change the capital structure in preparation for an IPO and not to change the economic or other nature of their investment in the Company." *Id.* The SEC determined that the Monk-Austin transaction would be exempt under Rule 16b-7. In St. Charles, the partnership involved sought guidance regarding Rule 16b-7 exemptions. *St. Charles, 1992 WL 146565, at * 1.* After analyzing the facts presented, the SEC concluded that the partnership's restructuring would be exempt under Rule 16b-7, because the proportionate interest of the shareholders was unchanged by the transaction. *Id.* at *4 (noting that the proposed restructuring is "within the spirit and intent of Rule 16b-7"). The foregoing analysis, as well as the courts discussion of the Rule 16b-3 and Rule 16b-7 adopting releases, demonstrate that the Amendments are consistent with the SEC's previously-stated positions regarding these rules. As such, the court concludes that the Amendments are not substantive changes in the law.

*11 [14] Levy also argues that the Amendments effect substantive changes in the law because they "rewrit[e]" Rules 16b-3(d) and 16b-7. (D.I. 239, at 6.) The court is not persuaded. A change in the text of a regulation does not necessarily denote a substantive change. *See* United States v. Marmolejos, 140 F.3d 488, 492 (3d Cir.1998); Homemakers North Shore, Inc. v. Bowen, 832 F.2d 408, 413 (7th Cir.1987)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 582555
--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)
**(Cite as: 2007 WL 582555 (D.Del.))**

Page 11

(noting that "[n]ew language need not imply new substance"). Moreover, the court believes that focusing its analysis on the fact that the text of the rule has changed would be a mistake. Instead, the proper focus should be on the effect of the change in the text of the rule. In the present case, as previously noted, the Third Circuit in *Levy* found the SEC's interpretations of the pre-amendment versions of Rules 16b-3 and 16b-7 less than clear. *See Levy, 314 F.3d at 112* ("the SEC has not set forth its interpretation [of section 16(b) ] clearly"); *id. at 114* ("In the absence of specific SEC guidance about which reclassifications are exempt from section 16(b) under Rule 16b-7, we believe that two principles should guide us.") The SEC, therefore, undertook to remove any doubt as to the meaning of those rules by amending them, but did not change its prior interpretation of the rules. Accordingly, as the court has already concluded above, the legal effect of the amended rules is the same as the legal effect of the pre-amendment rules. That is, despite the differences between the text of the Amendments rules and the pre-amendment rules, the SEC has consistently provided only one position with respect to Rules 16b-3 and 16b-7. *See First Nat'l Bank, 172 F.3d at 479.* [FN11] Therefore, the court concludes that the Amendments are clarifying amendments available to any transaction on or after August 15, 1996 and May 1, 1991, for rules 16b-3 and 16b-7, respectively.

C. Summary Judgment

Levy, National, and Sterling have filed cross-motions for summary judgment in this case. National and Sterling contend in their respective motions that, when shares are acquired as the result of a reclassification, the transaction cannot be considered a purchase for section 16(b) purposes, because it is exempt under Rule 16b-7. Additionally, Sterling argues that the reclassification is exempt under Rule 16b-3(d). Conversely, Levy argues that neither exemption to section 16(b) applies to the transactions at issue in the present case. Levy, however, has acknowledged that the defendants would be entitled to summary judgment if the Third Circuit had adopted the SEC's interpretation of Rules 16b-3 and 16b-7. (D.I. 143, at 5 ("It is no secret that if the Third Circuit had adopted the SEC's position that this litigation would have

been over--Defendants would have won as a matter of law and there would have been no need for additional proceedings beyond affirming the District Court's original decision.")); *See* Tr. at 5:11-22 (standing by position that the defendants would have won if the SEC position was adopted by the Third Circuit).

**\*12** [15] The elements of a claim under section 16(b) are that "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir.1998).* The only element that the parties dispute here is whether the reclassification transactions upon the conversion of the preferred stock into common stock were nonexempt purchases under section 16(b) of the Act. Having already determined that it should defer to the SEC's interpretations of Rules 16b-3(d) and 16b-7 in the Amendments, which provide that the reclassification transactions at issue are exempt because they are not within the purview of section 16(b), the court concludes that no genuine issue of material fact exists in the present case. Accordingly, the defendants are entitled to judgment as a matter of law. [FN12]

IV. CONCLUSION

For the aforementioned reasons, the defendants' motion will be granted and the plaintiff's motion will be denied.

ORDER

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. The plaintiff's Motion for Summary Judgment (D.I.119) is DENIED.

2. The defendant National's Motion for Summary Judgment (D.I.122) is GRANTED.

3. The defendant Sterling's Motion for Summary Judgment (D.I.125) is GRANTED.

4. Judgment is hereby entered in favor of the defend-

ants, National and Sterling.

5. The Clerk of Court is directed to close this case.

> FN1. The conversion of preferred stock to common stock in the reclassification was accomplished by dividing the liquidation value of the preferred stock (i.e. $1,000 per share plus accumulated unpaid dividends) by the price per share at which class A common stock would be offered to the public in the IPO, less the underwriting fees and commissions (i.e. $17.39). The conversion resulted in a 75 to 1 ratio.

> FN2. By 1999, Sterling's number of shares had grown to 14,212,000 shares of class A common stock and 28,396,000 shares of class B common stock.

> FN3. Prior to the Amendments, Rule 16b-3(d) stated:
> 17 C.F.R § 240.16b-3 Transactions between an issuer and its officers or directors.
> ....
> (d) Grants, awards and other acquisitions from the issuer. Any transaction involving a grant, award or other acquisition from the issuer (other than a Discretionary Transaction) shall be exempt if:
> (1) The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;
> (2) The transaction is approved or ratified, in compliance with section 14 of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; provided that such ratification occurs no later than the date of the next annual meeting of shareholders; or

> (3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such acquisition, provided that this condition shall be satisfied with respect to a derivative security if at least six months elapse from the date of acquisition of the derivative security to the date of disposition of the derivative security (other than upon exercise or conversion) or its underlying equity security.

> FN4. Prior to the Amendments, Rule 16b-7 stated:
> 17 C.F.R. § 240.16b-7 Mergers, reclassifications, and consolidations.
> (a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:
> (1) The acquisition of a security of a company, pursuant to a merger or consolidation, in exchange for a security of a company which, prior to the merger or consolidation, owned 85 percent or more of either (i) The equity securities of all other companies involved in the merger or consolidation, or in the case of a consolidation, the resulting company; or (ii) The combined assets of all the companies involved in the merger or consolidation, computed according to their book values prior to the merger or consolidation as determined by reference to their most recent available financial statements for a 12 month period prior to the merger or consolidation, or such shorter time as the company has been in existence.
> (2) The disposition of a security, pursuant to a merger or consolidation, of a company which, prior to the merger or consolidation, owned 85 percent or more of either (i) The equity securities of all other companies involved in the merger or consolidation or, in the case of a consolidation, the resulting company; or (ii) The combined assets of all the companies undergoing merger or consolidation, computed according to their book values prior to the merger or consolidation as determined by reference to their most re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 582555                                                                   Page 13
--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)
**(Cite as: 2007 WL 582555 (D.Del.))**

cent available financial statements for a 12 month period prior to the merger or consolidation.

(b) A merger within the meaning of this section shall include the sale or purchase of substantially all the assets of one company by another in exchange for equity securities which are then distributed to the security holders of the company that sold its assets.

(c) Notwithstanding the foregoing, if a person subject to section 16 of the Act makes any non-exempt purchase of a security in any company involved in the merger or consolidation and any non-exempt sale of a security in any company involved in the merger or consolidation within any period of less than six months during which the merger or consolidation took place, the exemption provided by this Rule shall be unavailable to the extent of such purchase and sale.

FN5. *Chevron* analysis also applies to an agency interpretation contained in a regulation. *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

FN6. Levy seems to suggest otherwise, arguing that the Amendments cannot overrule the Third Circuit's "mandate" in *Levy.* (D.I. 247, at 10- 11.) What Levy fails to appreciate, however, is the Third Circuit's guidance with respect to issues of interpretation, set forth in *United States v. Marmolejos,* for example, in which Judge Rendell stated "[w]here a prior panel of this court has interpreted an ambiguous statute in one way, and the responsible administrative agency later resolves the ambiguity another way, this court is not bound to close its eyes to the new source of enlightenment." 140 F.3d 488, 493 (3d Cir.1998). Consequently, Levy's arguments to the contrary with respect to deference to administrative agency interpretations are misguided.

FN7. Further, the Senate Committee that considered the bill which became section

16(b) observed the following:

[a]mong the most vicious practices unearthed at the hearings before the subcommittee was the flagrant betrayal of their fiduciary duties by directors and officers of corporations who used their positions of trust and the confidential information which came to them in such positions, to aid them in their *market activities.* Closely allied to this type of abuse was the unscrupulous employment of inside information by large stockholders who, while not directors and officers, exercised sufficient control over the destinies of their companies to enable them to acquire and profit by information not available to others.

Interpretive Release on Rules Applicable to Insider Reporting and Trading, Release No. 34-18114, 46 Fed.Reg. 48,147 (Sept. 24, 1981) (quoting Stock Exchange Practices, Report of the Committee on Banking and Currency, S.Rep. No. 1455, 73rd Cong., 2d Sess., at 55 (1934)) (emphasis added).

FN8. The current version of Rule 16b-3(d) reads as follows, with the new language underlined:

17 C.F.R § 240.16b-3 Transactions between an issuer and its officers or directors.

....

(d) *Acquisitions from the issuer.* Any transaction, other than a Discretionary Transaction, involving an acquisition from the issuer (*including without limitation a grant or award*), whether or not intended for a compensatory or other particular purpose, shall be exempt if:

(1) The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;

(2) The transaction is approved or ratified, in compliance with section 14 of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 582555                                                                      Page 14
--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)
(Cite as: 2007 WL 582555 (D.Del.))

at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; provided that such ratification occurs no later than the date of the next annual meeting of shareholders; or

(3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such acquisition, provided that this condition shall be satisfied with respect to a derivative security if at least six months elapse from the date of acquisition of the derivative security to the date of disposition of the derivative security (other than upon exercise or conversion) or its underlying equity security.

FN9. The current version of Rule 16b-7 reads as follows, with the new language underlined:

17 C.F.R. § 240.16b-7 Mergers, reclassifications, and consolidations.

(a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:

(1) The acquisition of a security of a company, pursuant to a merger, *reclassification,* or consolidation, in exchange for a security of a company *that before* the merger, *reclassification,* or consolidation, owned 85 percent or more of either: (i) The equity securities of all other companies involved in the merger, *reclassification,* or consolidation, or in the case of a consolidation, the resulting company; or (ii) The combined assets of all the companies involved in the merger, *reclassification,* or consolidation, computed according to their book values *before* the merger, *reclassification,* or consolidation as determined by reference to their most recent available financial statements for a 12 month period *before* the merger, *reclassification,* or consolidation, or such shorter time as the company has been in existence.

(2) The disposition of a security, pursuant to

a merger, *reclassification,* or consolidation, of a company *that before* the merger, *reclassification,* or consolidation, owned 85 percent or more of either (i) The equity securities of all other companies involved in the merger, *reclassification,* or consolidation or, in the case of a consolidation, the resulting company; or (ii) The combined assets of all the companies undergoing merger, *reclassification,* or consolidation, computed according to their book values *before* the merger, *reclassification,* or consolidation as determined by reference to their most recent available financial statements for a 12 month period *before* the merger, *reclassification,* or consolidation.

(b) a merger within the meaning of this section shall include the sale or purchase of substantially all the assets of one company by another in exchange for equity securities which are then distributed to the security holders of the company that sold its assets.

(c) *The exemption provided by this section applies to any securities transaction that satisfies the conditions specified in this section and is not conditioned on the transaction satisfying any other conditions.*

(d) Notwithstanding the foregoing, if a person subject to section 16 of the Act makes any non-exempt purchase of a security in any company involved in the merger, *reclassification,* or consolidation and any non-exempt sale of a security in any company involved in the merger, *reclassification,* or consolidation within any period of less than six months during which the merger, *reclassification,* or consolidation took place, the exemption provided by this *section* shall be unavailable to the extent of such purchase and sale.

FN10. The court is also persuaded by the opinion in *Gryl v. Shire Pharmaceuticals Group PLC,* in which the United States Court of Appeals for the Second Circuit held that Rule 16b-3(d) exempted acquiror directors' acquisitions and sales of acquiror op-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tions upon conversion of their target options in a corporate merger. *See* 298 F.3d 136, 145-46 (2d Cir.2002) ( "So long as the relevant securities transaction is between an issuer and insider, and so long as the terms and conditions of that transaction receive advance approval by the board of directors, there exists sufficient protection to ensure that any short-swing profit taking that follows is not the result of unfair market manipulation.")

FN11. Levy advances a number of other arguments as to why the Amendments effect substantive changes in the law, including: (1) the length of time that elapsed from the initial adoptions of the Rules and the Amendments (D.I. 239, at 6 or 7 op br); (2) the length of time that elapsed from the publishing of the Amendments to their adoption (Id. at 7); (3) the fact that the Amendments were adopted by a notice and comment period (Id. at 6-7); and (4) the fact that the SEC invoked its legislative authority in proposing the Amendments (Id. at 8). These arguments may be an attempt to divert the court from the real task at hand, which is determining, as it has, whether the Amendments change the nature and extent of the law. Thus, the court will not consider them in its analysis.

FN12. Because the court has determined that the defendants are entitled to summary judgment based on Rules 16b-3(d) and 16b-7, it need not consider their alternative legal theories for summary judgment.

--- F.Supp.2d ----, 2007 WL 582555 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2867860 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Brief Regarding Sec Amendments, Pursuant to Order of August 11, 2005 (Sep. 22, 2005)Original Image of this Document with Appendix (PDF)

• 2005 WL 2867859 (Trial Motion, Memorandum and Affidavit) Answering Brief by Defendants Ster-

ling holding Company, Loci and National Semiconductor Corporation Pursuant to the Court's Order of August 11, 2005 (Sep. 15, 2005)Original Image of this Document (PDF)

• 2005 WL 2603588 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opening Brief Regarding Sec Amendments, Pursuant to Order of August 11, 2005 (Sep. 1, 2005)Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

TINNEY v. GENESEO COMMUNICATIONS, INC.     **495**
Cite as 457 F.Supp.2d 495 (D.Del. 2006)

Stuart TINNEY, Plaintiff,

v.

GENESEO COMMUNICATIONS, INC.,
Cambridge Telecom, Inc., the Black-
stone Group, Cass Communications
Management, Inc., Technology Group,
LLC, the Tcw Funds, Montrose Mutu-
al Pcs, Inc., Gridley Enterprises, Inc.,
Timothy M. Yager, and Airgate Pcs,
Inc., Defendants.

No. 03–1126 SLR.

United States District Court,
D. Delaware.

Oct. 10, 2006.

**Background:** Shareholder in target cor-
poration sued principal shareholders of ac-
quiring corporation, seeking declaratory
judgment that sale of stock in target cor-
poration was "short-swing trading" barred
by the Securities Exchange Act, damages
in the amount of any short-swing profits
realized through sale, and reasonable costs
and expenses. Defendants filed motion for
judgment on the pleadings.

**Holdings:** The District Court, Sue L.
Robinson, Chief Judge, held that:

(1) Securities and Exchange Commission
(SEC) had the power to enact exemp-
tions precluding liability under Securi-
ties Exchange Act's ban against short-
swing profit-taking by issuer insiders
based on approval of transaction by
issuer's board of directors, and amend-
ment stating that transactions need not
have a compensatory element to be
eligible for such exemptions;

(2) amendment to rule governing eligibili-
ty for exemptions was an interpretive
clarification, rather than a new rule;
and

(3) material issues of fact, including
whether principal shareholders of ac-
quiring corporation were "directors,"

for purposes of Act, precluded judg-
ment on the pleadings.

Motion denied.

**1. Federal Civil Procedure** ⚷1053.1

When deciding a motion for judgment
on the pleadings, a district court must view
the facts and inferences to be drawn from
the pleadings in the light most favorable to
the non-moving party.   Fed.Rules Civ.
Proc.Rule 12(c), 28 U.S.C.A.

**2. Federal Civil Procedure** ⚷1049.1,
    1055

A motion for judgment on the plead-
ings can be granted only if no relief could
be afforded under any set of facts that
could be provided; however, the court need
not adopt conclusory allegations or state-
ments of law.   Fed.Rules Civ.Proc.Rule
12(c), 28 U.S.C.A.

**3. Federal Civil Procedure** ⚷1044,
    1045.1

Judgment on the pleadings will only
be granted if it is clearly established that
no material issue of fact remains to be
resolved and that the movant is entitled to
judgment as a matter of law.   Fed.Rules
Civ.Proc.Rule 12(c), 28 U.S.C.A.

**4. Securities Regulation** ⚷53.13

A successful claim to recover profits
from a short-swing transaction requires
proof of (1) the purchase (2) and sale of
securities (3) by an insider, that is, one of
the issuer's officers or directors or a
shareholder who possesses more than 10%
of any one class of the issuer's securities
(4) within a six-month period of time.   Se-
curities Exchange Act of 1934, § 16(b), 15
U.S.C.A. § 78p(b).

**5. Securities Regulation** ⚷53.13

Securities Exchange Act section im-
posing liability for short-swing profits aims

to keep people from profiting off of insider information. Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b).

**6. Securities Regulation ⟜53.17(1)**

Securities and Exchange Commission (SEC) had the power to enact the exemptions precluding liability under Securities Exchange Act's ban against short-swing profit-taking by issuer insiders based on approval of transaction by issuer's board of directors, as well as amendment stating that transactions need not have a compensatory element to be eligible for such exemptions. Securities Exchange Act of 1934, §§ 16(b), 23, 15 U.S.C.A. §§ 78p(b), 78w; 17 C.F.R. § 240.16b–3(d).

**7. Securities Regulation ⟜53.17(1)**

Amendment to rule, stating that transactions need not have a compensatory element to be eligible for exemptions precluding liability under Securities Exchange Act's ban against short-swing profit-taking by issuer insiders based on approval of transaction by issuer's board of directors, was an interpretive clarification, which was available to any transaction on or after August 15, 1996 that satisfied the regulatory conditions so clarified, rather than a new rule. Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b); 17 C.F.R. § 240.16b–3(d).

**8. Declaratory Judgment ⟜326**

Material issues of fact, including whether principal shareholders of acquiring corporation were "directors," for purposes of exemptions precluding liability under Securities Exchange Act's ban against short-swing profit-taking by issuer insiders based on approval of transaction by issuer's board of directors, precluded judgment on the pleadings in action filed by shareholder in target corporation, seeking declaratory judgment that sale of stock in target corporation was illegal short-swing trading. Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b); 17 C.F.R. § 240.16b–3(d).

———

Jeffrey S. Goddess, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE, for Plaintiff.

Arthur G. Connolly, III, Esquire, Kevin F. Brady, Esquire, Connolly, Bove, Lodge & Hutz; Rudolph J. Scaggs, Jr., Esquire, Natalie Jenaye Haskins, Esquire, Morris, Nichols, Arsht & Tunnell; Diane Zilka, Esquire, Grant & Eisenhofer, P.A.; Kurt M. Heyman, Esquire, Patricia L. Enerio, Esquire, Proctor Heymann LLP, Wilmington, DE, for Defendants. Of Counsel: Daniel H. Shulman, Esquire, J. Gregory Deis, Esquire, John M. Touhy, Esquire, Mayer Brown Rowe & Maw, Chicago, IL.

**MEMORANDUM OPINION**

SUE L. ROBINSON, Chief Judge.

**I. INTRODUCTION**

On December 11, 2003, plaintiff Stuart Tinney filed this action, on behalf of nominal defendant AirGate PCS ("AirGate"), against defendants Geneseo Communications, Inc. ("Geneseo"), Cambridge Telecom, Inc. ("Cambridge"), The Blackstone Group ("Blackstone"), Trust Company of the West ("TCW"), Cass Communications Management, Inc. ("Cass"), Technology Group, LLC ("Technology Group"), Montrose Mutual PCS, Inc. ("Montrose"), Gridley Enterprises, Inc. ("Gridley"), Timothy M. Yager, Peter G. Peterson, and Stephen A. Schwarzman, alleging violations of § 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b). (D.I.1) On April 27, 2004, plaintiff filed an amended complaint. (D.I.13) Defendants filed a motion to dismiss (D.I.17), which this court granted in part (as to defendants

TINNEY v. GENESEO COMMUNICATIONS, INC.    **497**
Cite as 457 F.Supp.2d 495 (D.Del. 2006)

Peter G. Peterson and Stephen A. Schwarzman), and denied in part (with respect to the remaining movants).[1] (D.I.34) In July 2005, plaintiff agreed substitute the TCW Funds as defendants in TCW's stead.[2] (D.I.81) At issue is defendants' motion for judgment on the pleadings.[3] (D.I.87) The court has jurisdiction over this motion pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1337.

## II. BACKGROUND

Plaintiff was a shareholder in AirGate, a Delaware corporation. (D.I. 13 at ¶¶ 6–7) Plaintiff alleges that defendants were all principal shareholders of iPCS, Inc. ("iPCS"), a private company that planned to merge with AirGate. (D.I.13, *passim*) AirGate and iPCS signed their formal merger agreement (the "merger agreement") on August 28, 2001. (*Id.* at ¶ 19) The merger agreement provided that iPCS would become a wholly owned subsidiary of AirGate. (D.I. 19, ex. 1 at 42) Also on August 28, 2001, AirGate and defendants entered into agreements requiring defendants to vote all their shares in support of the merger agreement. (D.I. 19, ex. 1 at 54) Defendants likewise entered into lock-

up agreements prohibiting them from selling any AirGate stock acquired through the merger without AirGate's prior consent for at least 120 days after the merger. (*Id.*) The merger agreement gave defendants the right to designate three directors to AirGate's nine member board upon the merger's effective date. (D.I. 13 at ¶ 31; D.I. 89, ex. A at 56–57) AirGate further agreed to appoint at least one director designated by defendants to board committees. (*Id.*)

On November 27, 2001, the shareholders of AirGate approved the merger agreement. (D.I. 13 at ¶ 36) The merger took effect on November 30, 2001, at which time defendants' iPCS preferred stock was converted into iPCS common stock. (D.I. 89, ex. A at 3) When iPCS shareholders surrendered their iPCS stock certificates, they received about .1594 shares of AirGate common stock per share of iPCS.[4] (D.I. 13 at ¶ 38; D.I. 28 at 7; D.I. 19, ex. 1 at 42–43) The conversion rate was adjustable if there was

> any inaccuracy in the number of outstanding shares of iPCS common stock, preferred stock, options, warrants or

---

1. The court denied defendants' motion to dismiss because the factual record was "undeveloped and less than illuminating" at that point and it was unclear to the court whether defendants were "directors" for purposes of the Exchange Act. (D.I. 34 at 7–8)

2. The "TCW Funds" are TCW/Crescent Mezzanine Partners II, LP; TCW Crescent Mezzanine Trust II; TCW Leveraged Income Trust, LP; TCW Leveraged Income Trust II, LP; TCW Leverage Income Trust IV, LP; TCW Shared Opportunity Fund II, LP; Shared Opportunity Fund IIB, LLC; and TCW Shared Opportunity Fund III, LP. (D.I.81)

3. On November 29, 2005, plaintiff filed a motion seeking leave to file a sur-reply with respect to defendants' motion for judgment on the pleadings. (D.I.107) Plaintiff's motion is denied as moot.

4. After the merger, defendants owned the following percentages of AirGate's common stock:

| | | |
|---|---|---|
| (1) | Geneseo: | 9.6% |
| (2) | Cambridge: | 8.2% |
| (3) | Blackstone: | 16.2% |
| (4) | TCW: | 4% |
| (5) | Cass: | 2.7% |
| (6) | Technology Group: | 2.7% |
| (7) | Montrose: | 2.7% |
| (8) | Gridley: | 1.4% |
| (9) | Yager: | 1% |

(D.I. 13 at ¶ 39) Plaintiff alleges that defendants were a "group" pursuant to § 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and, therefore, that defendants collectively owned more than 10% of AirGate's shares. (*Id.* at ¶¶ 32–34) This would make them insiders subject to the restrictions of § 16(b). 15 U.S.C. § 78p(b).

other stock equivalents presented by iPCS to AirGate;

the issuance after August 28, 2001 of options, warrants or other rights to purchase iPCS common stock; or

any stock split, reverse stock split, stock dividend, recapitalization, reclassification or other like change with respect to iPCS common stock occurring before the merger.

(D.I. 19, ex. 1 at 42)

On December 11, 2001, less than six months after the merger, defendants sold approximately 4 million shares of their AirGate stock. (D.I. 13 at ¶ 41) Plaintiff requests a declaratory judgment that this sale constituted "short-swing trading" barred by § 16(b) of the Exchange Act and seeks damages in the amount of any short-swing profits realized by defendants, as well as reasonable costs and expenses. (D.I. 13 at 17)

**III. STANDARD OF REVIEW**

[1–3]  When deciding a Rule 12(c) motion for judgment on the pleadings, a district court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *Green v. Fund Asset Mgmt., L.P.,* 245 F.3d 214, 220 (3d Cir.2001); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 406 (3d Cir.1993). The motion can be granted only if no relief could be afforded under any set of facts that could be provided. *Turbe v. Gov't of the Virgin Islands,* 938 F.2d 427, 428 (3d Cir.1991); *see also Southmark Prime Plus. L.P. v. Falzone,* 776 F.Supp. 888, 891 (D.Del.1991); *Cardio–Medical Associates, Ltd. v. Crozer–Chester Medical Ctr.,* 536 F.Supp. 1065, 1072 (E.D.Pa.1982) ("If a complaint contains even the most liberal of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied."). However, the court need not adopt conclusory allegations or statements of law. *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1125 (D.Del.1988). Judgment on the pleadings will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 290 (3d Cir.1988).

**IV. DISCUSSION**

Section 16(b)of the Exchange Act (" § 16(b)") bans transactions known as "short-swing trading":

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months.

15 U.S.C. § 78p(b). The Exchange Act also grants the Securities and Exchange Commission ("SEC") the "power to make such rules and regulations as may be necessary or appropriate to implement the provisions of [the Exchange Act] for which [it is] responsible or for the execution of the functions vested in [it]" by Congress. 15 U.S.C. § 78w.

The merger agreement in the case at bar stated that, prior to the merger's effective date, AirGate would "take all such steps as may be required to cause any acquisitions of Public Common Stock ... resulting from the transactions contemplated by this Agreement ... to be exempt under [SEC] Rule 16b–3[,] ... such steps to be taken in accordance with the interpretive guidance of the SEC." (D.I. 89, ex. A at 56) Likewise, "[t]o the extent that [Blackstone] or any of its affiliates may be deemed a 'director by deputization,'" they were ostensibly granted exemption under Rule 16b–3(d)(1) by Air-Gate's Board of Directors. (*Id.*, ex. B at 9)

SEC Rule 16b–3 ("Rule 16b–3") exempts certain transactions between "an issuer and its officers or directors" from the requirements of § 16(b). 17 C.F.R. § 240.16b–3(a). In order to qualify for an exemption at the time of the AirGate/iPCS merger,[5] "[a]ny transaction involving a grant, award or other acquisition from the issuer (other than a Discretionary Transaction)" had to be:

(1) ... approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non–Employee Directors;

(2) ... approved or ratified ... by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with [ ] applicable laws ...; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; ... or

(3) ... held by the officer or director for a period of six months following the date of such acquisition ....

*Id.* § 240.16b–3(d) (2001). AirGate's Board of Directors and its shareholders approved the merger agreement (which contained the Rule 16b–3 exemption clause). (D.I. 19, ex. 1 at 33; D.I. 13 at ¶ 36; *see also* D.I. 89, ex. B)

[4] A successful claim to recover profits from a short-swing transaction requires proof of (1) the purchase (2) and sale of securities (3) by an insider (one of the issuer's officers or directors or a shareholder who possesses more than 10% of any one class of the issuer's securities) (4) within a six-month period of time. *See Levy v. Sterling Holding Co.,* 314 F.3d 106, 111 (3d Cir.2002) (quoting *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir.1998)). The first, second, and fourth elements have been fulfilled in the case at bar; therefore, the success of plaintiff's claim depends on whether, at the time of the stock sale, defendants were insiders for the purposes of § 16(b) and, if so, whether the transaction is exempt from § 16(b) scrutiny under Rule 16b–3.

Plaintiff contends that, at all relevant times, defendants were "deputized directors of AirGate" and "subject to [§ ] 16(b) of the Exchange Act." (D.I. 13 at ¶ 55) In the alternative, he argues that "[b]y virtue of the Merger Agreement and related agreements, all defendants ... became beneficial owners of Airgate stock for [§ ] 16(b) purposes." (*Id.* at ¶ 53) Therefore, he maintains, "[s]ince the holdings in subject securities of all group members may be aggregated, all defendants were beneficial owners of 10% of AirGate stock" (*id.* at ¶ 54), which would bring defendants' sale of that stock within the scope of § 16(b) (*id.* at ¶¶ 51–54). Despite the exemption provision in the merger agree-

---

5. Rule 16b–3 was subsequently amended and now applies to "acquisition[s] from the issuer (including without limitation a grant or award), **whether or not intended for a compensatory or other particular purpose.**" 17 C.F.R. § 240.16b–3 (2005) (emphasis added).

ment, plaintiff avers that "[t]here are no exemptions applicable to the short swing transactions which are the subject of this lawsuit." [6]  (*Id.* at ¶ 62)

According to defendants, they were neither deputized directors of AirGate nor, for purposes of the Exchange Act, a group of beneficial owners holding more than 10% of the company's stock. (D.I. 18 at 2–3) Even if the court were to find such, defendants argue, the SEC's recent clarification of Rule 16b–3 [7] abrogates the Third Circuit's ruling in *Levy* and exempts defendants from liability under § 16(b). (D.I. 105 at 3)

### A.  Defendants' Eligibility to Invoke Rule 16b–3

In a Rule 12(c) motion for judgment on the pleadings, the court must view all facts and inferences in a light most favorable to

the non-moving party (plaintiff, in the case at bar). Plaintiff has based his entire complaint on the allegation that defendants are liable under § 16(b) because they were either directors or beneficial owners of 10% of the issuer's stock. (D.I. 13 at ¶¶ 8–16) If the court accepts plaintiff's allegations as true, and defendants are able to show that they are entitled to an exemption (either under Rule 16b–3 [8] or § 16(b) [9]), then the issues at bar become moot. If defendants, as they claim, do not qualify as beneficial owners or directors, then they cannot be characterized as "insiders" and liability under § 16(b) cannot attach.

### B.  The 2005 Amendment to Rule 16b–3

In 2002, the United States Court of Appeals for the Third Circuit held that state-

---

6.  Rule 16b–3 exemptions apply to "[g]rants, awards, and other acquisitions from the issuer." 17 C.F.R. § 240.16b–3. Plaintiff bases his claim (that no such exemptions apply to defendants' stock sale) on a 2002 ruling by the Third Circuit, *Levy v. Sterling Holding Co.*, 314 F.3d 106 (3d Cir.2002) (analyzing the **unamended** version of Rule 16b–3), which held that "Rule 16b–3 primarily is concerned with employee benefit plans," *id.* at 122, and that, in order to be an exempted "other acquisition," a transaction "should have some connection to a compensation-related function," *id.* at 124. Because defendants' acquisitions were not compensation-related, plaintiff argues, *Levy* precludes the application of a Rule 16b–3 exemption to the stock sale in issue at bar. (D.I. 28 at 22–23)

Plaintiff also states that, in its memorandum order of March 21, 2005 (D.I.34), this Court held, *inter alia*, that plaintiff's Amended Complaint properly alleged all elements of a[§ ] 16(b) claim against defendants and further held that the Third Circuit's decision in *Levy*, ... determining the exemptive scope of Rule 16b–3(d), controlled this case and mandated rejection of defendants' argument that Rule 16b–3(d) exempted the transaction at issue herein from [§ ] 16(b).

(D.I. 91 at 2) Plaintiff's statement is disingenuous: The court's memorandum order, though it cited *Levy* (D.I. 34 at 7), was not addressing defendants' exemption claims; instead, using the relatively deferential standard for a motion to dismiss, the court found that the factual record had not yet been sufficiently developed to justify dismissal of the claims against all but two of the defendants. (*Id.* at 8)

7.  After the *Levy* decision, the SEC "adopt[ed] amendments to two rules that exempt certain transactions from the private right of action to recover short-swing profit provided by Section 16(b) of the [Exchange Act]." 70 Fed.Reg. 46,080 (Aug. 9, 2005) (amending 17 C.F.R. § 240.16b–3).

8.  Rule 16b–3 exemptions are applicable only to "Transactions Between An Issuer and Its Officers or Directors," not those between an issuer and beneficial owners of its securities. 17 C.F.R. § 240.16b–3.

9.  "[Section 16(b) ] shall not be construed to cover any transaction where such beneficial owner was not such **both at the time of the purchase and sale,** or the sale and purchase, of the security or security-based swap agreement." 15 U.S.C. § 78p(b) (emphasis added).

ments in "the SEC's 1996 release adopting Rule 16b–3" "suggest that the SEC intended, in Rule 16b–3(d), to exempt [only] 'grants, awards, and other acquisitions' with some compensatory nexus." *Levy v. Sterling Holding Co.,* 314 F.3d 106, 122, 124 (3d Cir.2002). The SEC amended Rule 16b–3 in 2005 ("the amendment") in order to "eliminate the uncertainty generated by the *Levy v. Sterling* opinion" and specifically included non-compensatory acquisitions within the scope of Rule 16b–3's exemption.[10] 70 Fed.Reg. 46,080, 46,082 (Aug. 9, 2005); *see also* 17 C.F.R. § 240.16b–3 (2005) (exempting, under certain circumstances, "transaction[s] ... involving an acquisition from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose"). In addition, "[b]ecause they clarify regulatory conditions that applied to these exemptions since they became effective on August 15, 1996," the SEC stated that the

newly-amended versions of Rules 16b–3(d) and (e) "are available to any transaction on or after August 15, 1996 that satisfies the regulatory conditions so clarified." 70 Fed.Reg. 46,080, 46,080 (Aug. 9, 2005).

Under the *Levy* court's interpretation of the pre-amendment version of Rule 16b–3, defendants' decision to sell their AirGate stock within six months of acquiring it would not be eligible for exemption because the transaction did not have a compensatory element; if, however, the SEC is correct and the amendment's effect is retroactive to the date Rule 16b–3 was originally adopted, defendants' stock sale could potentially be exempt from scrutiny under § 16(b), even if defendants are properly classified as insiders.[11] In order to qualify for exemption in such a situation, defendants would have to show that they fulfilled the requirements of either Rule 16b–3(d)(1)[12] or Rule 16b–3(d)(2).[13] At the parties' request, the court will address the

---

10. In its explanation of the amendment, the SEC noted that the Third Circuit's "construction of Rule 16b–3 [in *Levy*] [was] not in accord with our clearly expressed intent in adopting the rule." 70 Fed.Reg. 46,080, 46,-081 (Aug. 9, 2005). In fact, on February 28, 2003, the SEC filed an *amicus* brief supporting the *Levy* defendants' petition for a rehearing and endorsed a construction of Rule 16b–3 antithetical to that adopted by the Third Circuit. *See* Memorandum by SEC as Amicus Curiae Supporting Appellees' Petition for Rehearing, *Levy v. Sterling Holding Co.,* 314 F.3d 106 (3d Cir.2002) (No. 02–1698).

11. According to defendants' counsel, after the court denied defendants' motion to dismiss, "the parties and the Court didn't put in a summary judgment schedule date ... because ... there was a proposed SEC amendment clarifying Rule [16b–3], an exemption," which defendants believed would be "dispositive if enacted." (D.I. 111 at 9) "[T]he Court," defendants state, "decided that the proper thing to do was for other parties to complete discovery. When the SEC finally clarified the rule, [defendants] could bring it to the Court's attention." (*Id.*) Defendants' counsel aver

that they have now done so, "styled ... as a motion for judgment on the pleadings," since "the SEC has clarified Rule [16b–3]." (*Id.* at 10) While plaintiff's counsel disagreed that a holding on the retroactivity of the SEC's clarification would be dispositive of the entire case, the parties agree that it would be helpful for the court to rule on the exemption and retroactivity issues presented by the motion for judgment on the pleadings before conducting any further motion practice in this case. (*Id.* at 10–12)

12. Transactions are exempt under Rule 16b–3(d)(1) if they are "approved by the board of directors of the issuer." 17 C.F.R. § 240.16b–3(d)(1).

13. Rule 16b–3(d)(2) exempts transactions that have been "approved or ratified ... [by] the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated." 17 C.F.R. § 240.16b–3(d)(2).

retroactive effect of the SEC's clarifying amendment.

### C. Retroactive Effect of the Amendment

Years before the *Levy* court's finding that Rule 16b–3 required exempted transactions to have some sort of "compensatory nexus," the SEC (upon adopting changes to Rule 16b–3 in 1996) stated that, "unlike the current [pre–1996] rule, a transaction need not be pursuant to an employee benefit plan or any compensatory program to be exempt, nor need it specifically have a compensatory element." 61 Fed.Reg. 30,376, 30,378–30,379 (June 14, 1996). Despite this, the *Levy* court agreed with the appellant's assertion that

> "the mere fact that the transaction does not need ... to have a **specifically** compensatory element does not mean that the transaction does not need to have any compensatory element whatsoever.... In fact, what **specifically** implies is that there still needs to be some compensatory element to the transaction even if it is not the primary one."

*Levy*, 314 F.3d at 122 (emphasis and omissions in original) (quoting appellant's reply brief at 23–24, *Levy*, 314 F.3d 106). Because of this, the SEC amended Rule 16b–3 to more clearly state that a compensatory element is not required for an exemption; the SEC also explained that this had been the meaning of the rule since its enactment in 1996. 70 Fed.Reg. 46,080, 46,080–46,082 (Aug. 9, 2005). Defendants claim that, since the SEC has stated that the amendment's clarification is retroactive, any transactions related to the Air-Gate/iPCS merger are exempt under Rule 16b–3. (D.I 88 at 11) Plaintiff, meanwhile, avers that "[t]he SEC's use of the term 'clarifying' will not endow the Amendment with retroactive effect," and that "the [SEC's] views as to whether its rules are

legislative or interpretive are not entitled to deference." (D.I. 91 at 9)

The court's inquiry will begin with the question of whether the SEC was authorized to exempt certain kinds of insider short-swing transactions from liability under § 16(b). If so, the court will then address the ability of the SEC to "clarify" its rules and make those clarifications retroactive.

#### 1. Judicial Deference to Administrative Actions

[5] In explaining the United States Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Third Circuit stated:

> Under *Chevron*, we must first determine if Congress has spoken directly to the question at issue. If Congress' intent is clear, our inquiry must end and we "must give effect to the unambiguously expressed intent of Congress." If we decide Congress has not directly spoken to the issue and that "the statute is silent or ambiguous with respect to the specific issue," we must ask whether the agency's interpretation is based on a "permissible construction of the statute." If we find it is, we give deference to that interpretation. If Congress "explicitly left a gap for an agency to fill ... a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."

*Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 281 (3d Cir.2002) (omission in original) (quoting *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778). Section 16(b) of the Exchange Act states that its purpose is to "prevent[ ] the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the

issuer," 15 U.S.C. § 78p(b); in other words, § 16(b) aims to keep people from profiting off of insider information. Congress also decreed that § 16(b) "shall not be construed to cover ... any transaction or transactions which the [SEC] by rules and regulations may exempt as not **comprehended within the purpose of this subsection**." *Id.* (emphasis added). Congress, therefore, gave the SEC substantial latitude in deciding which kind of insider transactions to exempt from § 16(b) scrutiny.

In 1996, the SEC adopted the Rule 16b–3 exemptions at issue in the case at bar in order "to align better the regulatory requirements under the rule with the statutory goals underlying section 16." 61 Fed. Reg. 30,376, 30,380 (June 14, 1996). The SEC intended the 1996 revisions to "streamline the Section 16 regulatory scheme, particularly with respect to transactions between an issuer and its officers and directors; ... broaden exemptions from short-swing profit recovery where consistent with the statutory purposes; and codify several staff interpretive positions." *Id.* at 30,376.

[6] In the case at bar, Congress "explicitly left a gap for [the SEC] to fill," and the SEC enacted a new version of Rule 16b–3 consistent with what it reasonably believed to be § 16(b)'s statutory purpose; therefore, this court "may not substitute its own construction" for, and must give deference to, the SEC's interpretation of § 16(b). *Robert Wood Johnson,* 297 F.3d at 281. Because the court finds that the SEC had the power to enact the exemptions listed in Rule 16b–3 (as well as the 2005 amendment stating that transactions need not have a compensatory element in order to be eligible for such exemptions), the question now becomes whether defendants' transaction, which occurred in 2001, is controlled by the *Levy* court's interpre-

tation of the unamended version of Rule 16b–3 or the SEC's 2005 "retroactive clarification."

**2. Retroactivity**

The SEC has clearly stated that the amendment was meant only as a clarification in light of what it contends was the Third Circuit's erroneous construction in *Levy.* 70 Fed.Reg. 46,080, 46,081 (Aug. 9, 1995). Plaintiff avers that "[t]he Amendment here has all the hallmarks of a legislative rule and none of the indicia of being an interpretation." (D.I. 91 at 10)

In *Appalachian States Low–Level Radioactive Waste Commission v. O'Leary,* 93 F.3d 103 (3d Cir.1996), which applied the *Chevron* analysis to the Secretary of Labor's interpretation of a statute, the Third Circuit found that "[t]he Secretary's ruling was interpretive." *Id.* at 112.

> "Interpretive rules constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. Interpretive rules are not intended to alter legal rights, but to state the agency's view of what existing law requires. Such rules 'merely clarify or explain existing law or regulations.' 'If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive.' A rule is also interpretive if the statutory scheme would have been fully operative without the regulations and the regulation merely published standards to be used in agency adjudication."

*Id.* at 112–13 (internal citations omitted). The Third Circuit also recognized that, [while] [r]etroactive rulemaking is presumptively impermissible, *see Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *see also Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), retroactivity

concerns are irrelevant to this case. The Secretary's ruling was interpretive. It therefore did not alter existing rights or obligations; **it merely clarified what those existing rights and obligations had always been.** *See Manhattan Gen. Equip. Co. v. Commissioner,* 297 U.S. 129, 135, 56 S.Ct. 397, 80 L.Ed. 528 (1936) (explaining that agency rule interpreting a statute "is no more retroactive in its operation than a judicial determination construing and applying a statute to a case in hand"). As a result, her interpretation had no prohibited retroactive impact.

*Appalachian States,* 93 F.3d at 113 (emphasis added). Under the Third Circuit's rulings, the critical factor in determining the retroactive effect of the 2005 amendment to Rule 16b–3 is whether the amendment is properly characterized as a new rule or as a "clarification" of what Rule 16b–3 has always meant.[14]

The United States Supreme Court, in *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), "confront[ed] an [administrative agency's informal] interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking." *Id.* at 587, 120 S.Ct. 1655. According to the Court, "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Id.* The Court stated that the agency's request for

deference was an attempt "to overcome the regulation's obvious meaning," and that "deference is warranted only when the language of the regulation is ambiguous. . . . To defer to the agency's position" in a case where the regulation's language is clear "would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Id.* at 588, 120 S.Ct. 1655.

The Third Circuit acknowledged in *Levy* that its holding was based on statements in the SEC's adopting release which the court believed "**strongly suggest[ed] that the SEC intended,** in Rule 16b–3(d), to exempt 'grants, awards, and other acquisitions' with some compensatory nexus." *Levy v. Sterling Holding Co.,* 314 F.3d 106, 124 (3d Cir.2002) (emphasis added). The SEC filed an *amicus* brief in the case stating that the proposed narrow construction of the Rule, in fact, was not consistent with its intentions. The fact that the SEC and Third Circuit could be so at odds over the correct interpretation of the Rule indicates that the pre-amendment language of Rule 16b–3 was ambiguous.

[7] The SEC protested the *Levy* court's interpretation of Rule 16b–3 at the time the decision was rendered, and later enacted an amendment to clarify its reasoning underlying the Rule. Deferring to the SEC's interpretation that Rule 16b–3 has never required a compensatory element would not be, in this case, "to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation," *Christensen,* 529 U.S. at 588, 120 S.Ct. 1655, nor would it allow the SEC

---

14. Plaintiff cites to *United States v. Diaz,* 245 F.3d 294 (3d Cir.2001), for the Third Circuit's statement that "[g]enerally, if the amended guideline and commentary overrules a prior judicial construction of the guidelines" (such as *Levy* in the case at bar), "[the amendment] is substantive; if it confirms our prior reading of the guidelines and does not disturb prior

precedent, it is clarifying." *Diaz,* 245 F.3d at 303. *Diaz,* however, was a criminal case (with accompanying due process and *ex post facto* concerns) addressing "post-sentencing amendment[s] to a guideline, or to its comments," *id.,* and is distinguishable from the situation at bar. The court, therefore, will not use this standard in its analysis.

" 'to change a legislative rule retroactively through the process of disingenuous interpretation of the rule to mean something other than its original meaning,' " *Caruso v. Blockbuster–Sony Music Entertainment Centre at Waterfront,* 193 F.3d 730, 737 (3d Cir.1999) (citation omitted). The SEC's amendment "did not alter existing rights or obligations; it merely clarified what those existing rights and obligations had always been." *Appalachian States Low–Level Radioactive Waste Com'n v. O'Leary,* 93 F.3d at 113. Therefore, the court finds that the 2005 amendment to Rule 16b–3 was an interpretive clarification which is "available to any transaction on or after August 15, 1996 that satisfies the regulatory conditions so clarified." 70 Fed.Reg. 46,080, 46,080 (Aug. 9, 2005).

[8] A court may only grant a motion for judgment on the pleadings if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 290 (3d Cir.1988). A number of material issues of fact still remain in the case at bar, including those identified by the court in its memorandum opinion denying defendants' motion to dismiss. (D.I.34) Consequently, the court finds that defendants are not entitled to judgment as a matter of law at this time and denies their motion for judgment on the pleadings.

## V. DISCUSSION

For the reasons stated above, defendants' motion for judgment on the pleadings is denied. Plaintiff's motion for leave to file is denied as moot. An appropriate order shall issue.

## ORDER

At Wilmington this 10th day of October, 2006, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendants' motion for judgment on the pleadings (D.I.87) is denied.

2. Plaintiff's motion for leave to file a sur-reply (D.I.107) is denied as moot.



**Ronald S. RILEY, Plaintiff,**

v.

**The DELAWARE RIVER AND BAY AUTHORITY, et al., Defendants.**

**No. CIVA 05–746 KAJ.**

United States District Court, D. Delaware.

Oct. 25, 2006.

**Background:** African-American male employee brought action against public employer, the Delaware River and Bay Authority (DRBA), alleging race discrimination, in failing to adequately compensate him, failing to promote him, and creating a hostile work environment, in violation of Title VII and § 1981 and § 1983. Employer moved to dismiss.

**Holdings:** The District Court, Jordan, J., held that:

(1) employee's failure to allege in his complaint that he received a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC) did not deprive District Court of jurisdiction;

(2) alleged discrete acts of inadequate pay and failure to promote would be considered by the District Court;

# EXHIBIT C

(1972) (closely regulated businesses); *Camara,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (administrative searches); *Nicholas v. Goord,* 430 F.3d 652 (2d Cir. 2005) (DNA extraction from inmates).

[15] Our holding in this case is a narrow one. We are not holding that the police are entitled to pat down a person, absent reasonable suspicion that he is armed, simply because they have stopped that person pursuant to a lawful *Terry* stop. However, in cases where the police may lawfully transport a suspect to the scene of the crime in the rear of a police car, the police may carry out a departmental policy, imposed for reasons of officer safety, by patting down that person. Because the police must have a legitimate law-enforcement reason to transport a suspect, we see little danger that policies such as these might be used as a pretext for a suspicionless frisk.

Applying these rules to this case is now straightforward. We have already said that McCargo was lawfully stopped and that the police were entitled to transport McCargo to the scene of the crime. The officers testified, and the district court found, that the officers frisked McCargo pursuant to a generally applicable police policy that required all persons placed in patrol cars to be frisked. There are no allegations, much less proof, of bad faith or pretext on the part of the police. Therefore, the frisk of McCargo was constitutional, and the judgment of the district court should be reversed.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.



Marc BRUH, Plaintiff–Counter–
Defendant–Appellant,

v.

**BESSEMER VENTURE PARTNERS
III L.P., Defendant–Counter–
claimant–Appellee,**

**Vistacare, Inc., Defendant.**

Docket No. 05–5271–cv.

United States Court of Appeals,
Second Circuit.

Argued: April 7, 2006.

Decided: Sept. 13, 2006.

**Background:** Shareholder brought derivative action against fellow shareholder for disgorgement of profit from alleged insider trading by selling shares within six months after conversion of preferred stock into common stock. The United States District Court for the Southern District of New York, George B. Daniels, J., entered summary judgment in favor of defendants. Plaintiff appealed.

**Holdings:** The Court of Appeals, John Gleeson, District Judge, sitting by designation, held that:

(1) Securities and Exchange Commission's (SEC's) construction of prior regulation as exempting stock reclassifications from short-swing insider trading liability was not plainly erroneous and was controlling, and

(2) the conversion was exempt reclassification.

Affirmed.

**1. Federal Courts ⟐776**

The Court of Appeals reviews the district court's grant of summary judgment de novo.

BRUH v. BESSEMER VENTURE PARTNERS III L.P.          **203**
Cite as 464 F.3d 202 (2nd Cir. 2006)

**2. Federal Courts** ⚖=762

The Court of Appeals may affirm summary judgment on any basis for which there is sufficient support in the record, including grounds not relied on by the district court.

**3. Securities Regulation** ⚖=53.18

Any profit realized from short-swing transaction of insider trading is recoverable by the corporation in a suit against the insider, brought either by the corporation itself or on behalf of the corporation by a shareholder. Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b).

**4. Securities Regulation** ⚖=53.16(10)

Securities and Exchange Commission's (SEC's) construction of prior regulation as exempting stock reclassifications from short-swing insider trading liability was not plainly erroneous under *Seminole Rock* deference and was controlling as applied to conversion of preferred stock into common stock; although word "reclassification" was part of title but not text, the SEC interpretation could reasonably be reconciled with regulatory history of SEC's treatment of reclassifications. 17 C.F.R. § 240.16b–7.

**5. Administrative Law and Procedure** ⚖=413

In the interpretation of an administrative regulation, a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt; the administrative interpretation becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation, and the agency's interpretation need not be the best or most natural one by grammatical or other standards, but only needs to be reasonable to warrant deference.

**6. Securities Regulation** ⚖=53.16(10)

Conversion of shareholder's preferred stock into common stock was "reclassification" exempt from prohibition against short-swing insider trading; the shareholder received the same form and amount of consideration per share. Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b); 17 C.F.R. § 240.16b–7.

See publication Words and Phrases for other judicial constructions and definitions.

Jeffrey S. Abraham (Mitchell M.Z. Twersky and Ximena Skovron, on the brief), Abraham Fruchter & Twersky, LLP, New York, NY, for Plaintiff–Counter–Defendant–Appellant.

Vincent T. Chang (Frederick R. Kessler, on the brief), Wollmuth Maher & Deutsch LLP, New York, NY, for Defendant–Counterclaimant–Appellee.

Eric Summergrad, Deputy Solicitor, Securities and Exchange Commission (Allan A. Caputo, Special Counsel to the Solicitor; Brian G. Cartwright, General Counsel; and Jacob H. Stillman, Solicitor), Washington, DC, for Amicus Curiae Securities and Exchange Commission.

Before McLAUGHLIN, CABRANES, Circuit Judges, and GLEESON, District Judge.[1]

GLEESON, Judge.

Marc Bruh, a shareholder in VistaCare, Inc. ("VistaCare"), brought this action against Bessemer Venture Partners III, L.P. ("Bessemer"), pursuant to § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), seeking disgorgement of the profit Bessemer made when it sold shares of VistaCare common stock on May 13, 2003. The question presented on appeal is whether a stock reclassification—converting Bessemer's preferred stock into common—that occurred in December 2002

---

1. The Honorable John Gleeson, United States District Judge for the Eastern District of New

York, 1 sitting by designation.

can properly be matched against that sale and thus give rise to liability for short-swing insider trading under § 16(b). The United States District Court for the Southern District of New York (George B. Daniels, *Judge*) granted summary judgment for the defendants, and we affirm, though we arrive at that result by a different route.

## BACKGROUND

The relevant facts are not in dispute. In 1995 Bessemer purchased 305,292 shares of Series A–1 preferred stock in Vista Hospice Care, Inc. ("VHS") for $9.90 per share. By a recapitalization in 1998, VHS became a wholly-owned subsidiary of VistaCare, and Bessemer's shares in VHS were converted to Series A–1 preferred shares in VistaCare. Bessemer then, and at all times relevant thereafter, owned more than ten percent of VistaCare's stock and was therefore subject to § 16(b) liability as a statutory insider.[2]

In 1999 the VistaCare shareholders adopted a Third Amended and Restated Certificate of Incorporation, which provided:

> Upon the closing of a Qualified Initial Public Offering ["IPO"], each outstanding share of Series A–1 Preferred Stock

shall automatically be converted into a number of shares of Class A Common Stock equal to (i) the Original Issue Price of the Series A–1 Preferred Stock (as adjusted for any stock splits, stock dividends, recapitalizations and similar events), plus all accrued but unpaid dividends on such shares ..., divided by (ii) the per share price at which the Common Stock is sold to the public in the ... [IPO].

Two aspects of this provision are worthy of note. First, the conversion formula ensured that the aggregate value of Bessemer's investment in VistaCare would remain the same through the conversion: the greater the IPO price relative to the value of each of Bessemer's preferred shares, the fewer common shares Bessemer would receive, and vice versa. Second, the conversion was to be automatic. After negotiating the Third Amended Certificate, Bessemer did not retain the option of keeping its preferred shares in the event of a "[q]ualified" IPO, nor did it have the right to convert its preferred shares to common at any earlier time.

On December 17, 2002, VistaCare announced a Qualified IPO[3] and set the price of the offering at $12.00 per share. On

---

2. Section 16(b) applies to "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security." 15 U.S.C. § 78p(a)(1).

3. Whether an IPO "[q]ualified" was complicated. Specifically, a "Qualified Initial Public Offering" was defined as "a public offering of Common Stock managed by a nationally recognized investment banking firm pursuant to a registration statement filed with the Commission setting forth an anticipated public offering price range, the mid-point of which is equal to or greater than the greater of: (i)

$7.50 per share (appropriately adjusted for stock splits, stock dividends, recapitalizations and similar events) or (ii) the lesser of (A) $12.50 per share (appropriately adjusted for stock splits ... [etc.]) or (B) three times the Conversion Price of the Series B Preferred Stock, and which would, based on such midpoint, result in gross proceeds to the Corporation and/or selling stockholders of at least $25,000,000." Thus, the qualifying midpoint price—"equal to or greater than the greater of" those two defined quantities—was merely a floor, below which the conversion provision would not be triggered; contrary to Bruh's suggestion at oral argument, there was no ceiling price, above which an IPO would not qualify.

December 23, 2002, the deal closed, and Bessemer's preferred stock was converted into 251,865 shares of common stock. Trading opened at $15.90 per share. On May 13, 2003, VistaCare made a secondary offering of stock at $20.00 per share. Although Bessemer had requested that the secondary offering be delayed (perhaps in the hope of avoiding this lawsuit by allowing the six-month time frame in which short-swing trading is prohibited to expire), VistaCare declined, and Bessemer sold anyway. At the net price of $18.95 per share, compared to the $12.00 per share IPO price, Bessemer earned a profit of $1,725,275.25 on the 251,865 shares it acquired by the conversion of its preferred shares.[4] This action followed.

The district court granted summary judgment for Bessemer, concluding that "[t]he 'purchase' in the instant matter occurred at the time Bessemer contracted, … in 1995, to acquire [VHS] Preferred Stock." That, the district court held, was

"when Bessemer's rights and obligations became fixed and irrevocable." [SA 8.] Bruh appealed, and we invited the Securities and Exchange Commission ("SEC") to participate as *amicus curiae*.

## DISCUSSION

[1, 2] We review the district court's grant of summary judgment *de novo, see Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.2003), and we may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court, *see Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir.1997).

[3] Congress enacted § 16(b) "[f]or the purpose of preventing the unfair use of information" by corporate insiders trading securities issued by the company they manage or in which they hold a significant ownership interest. 15 U.S.C. § 78p(b).[5]

---

4. We note that $6.95, the profit per share, multiplied by 251,865 shares equals $1,750,461.75. The record does not disclose why the profit Bruh seeks to recover is approximately $25,000 less, but neither the difference nor the reason for it has any bearing on this appeal.

5. Section 16(b) provides:
    Profits from purchase and sale of security within six months
      For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act) involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any

intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act) involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

The mechanism adopted to that end is "a flat rule taking the profits out of a class of transactions"—so-called "short-swing" transactions involving a stock purchase and sale (or sale and purchase) by an insider within a period of less than six months—"in which the possibility of abuse was believed to be intolerably great," *Kern County Land Co., v. Occidental Petroleum Corp.*, 411 U.S. 582, 592, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) (internal quotation marks omitted). Any profit realized from such a transaction is recoverable by the corporation in a suit against the insider, brought either by the corporation itself or, as in this case, on behalf of the corporation by a shareholder.

Congress further provided, however, that § 16(b) "shall not be construed to cover … any transaction or transactions which the [Securities and Exchange] Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U.S.C. § 78p(b). One such exemption, Rule 16b-7, 17 C.F.R. § 240.16b-7, is the focus of the dispute between the parties here. And because that rule was amended by the Commission in 2005, after the transactions giving rise to this case took place, *see Ownership Reports and Trading by Officers, Directors and Principal Security Holders,* Exchange Act Release No. 52202, 70 Fed.Reg. 46080 (Aug. 9, 2005) (hereinaf-

ter "2005 Release"), the case implicates two versions of the Rule 16b-7 exemption.

Bruh contends that under the old Rule 16b-7, as interpreted by the Third Circuit in *Levy v. Sterling Holding Company,* 314 F.3d 106 (3d Cir.2002), the conversion of Bessemer's preferred stock into common was not exempt. He further contends that to the extent the new Rule 16b-7 would exempt that conversion, it may not be applied retroactively, *see Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Bessemer, with support from the Commission, argues that the new Rule 16b-7 is merely the old Rule properly understood. The Third Circuit's decision in *Levy,* they contend, was issued only "[i]n the absence of specific SEC guidance" on the question, 314 F.3d at 114, and that guidance having now been supplied, the Commission's reasonable interpretation of its own rule is entitled to deference under *Bowles v. Seminole Rock & Sand Company,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *see also Auer v. Robbins,* 519 U.S. 452, 461–62, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

[4] We hold that the Commission's construction of the old Rule 16b-7 is not plainly erroneous, and it is therefore controlling.[6] So construed, the rule relieves Bessemer of liability here.

---

**6.** The district court approached the case from the opposite direction, asking first whether the conversion of Bessemer's preferred stock into common constituted a "purchase" under § 16(b). It cited our advice in *Blau v. Lamb,* 363 F.2d 507, 518 (2d Cir.1966) that "in deciding whether a certain transaction is a Section 16(b) 'purchase' or 'sale' it is relevant to first consider whether the transaction in any way makes possible the unfair insider trading that Section 16(b) was designed to prevent." *See also Reliance Elec. Co. v. Emerson Elec. Co.,* 404 U.S. 418, 424 n. 4, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) ("In interpreting the terms 'purchase' and 'sale,' courts have

properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse."). Concluding that Bessemer's operative "purchase" occurred in 1995—a determination as to which we express no opinion—the district court had no need to consider Bessemer's argument that Rule 16b-7 exempted this transaction.

Although consideration—as a threshold matter—of whether a transaction constitutes a "purchase" may be necessary when it is clear that no exemption applies, *see At Home Corp. v. Cox Commc'ns, Inc.,* 446 F.3d 403, 408–10 (2d Cir.2006), such threshold consid-

BRUH v. BESSEMER VENTURE PARTNERS III L.P.    **207**
Cite as 464 F.3d 202 (2nd Cir. 2006)

A.    *Seminole Rock Deference*

[5]    We do not examine the Commission's exemptive rules with fresh eyes. Rather, in the "interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he administrative interpretation ... becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Seminole Rock,* 325 U.S. at 413–14, 65 S.Ct. 1215; *see also Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 128 (2d Cir.2000) ("We are bound by the SEC's interpretations of its regulations in its *amicus* brief, unless they are plainly erroneous or inconsistent with the regulations.") (internal quotation marks omitted); *Levy v. Southbrook Int'l Investments, Ltd.,* 263 F.3d 10, 16 (2d Cir.2001) (deference owed to SEC's interpretation of rules implementing § 16(b) when "neither plainly erroneous nor inconsistent with the regulations"). It is "axiomatic that the [agency's] interpretation need not be the best or most natural one by grammatical or other standards.... Rather, the [agency's] view need be only reasonable to warrant deference." *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 702, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991). We are thus obligated to accept the Commission's interpretation of Rule 16b–7—here expressed both by the Commission's *amicus* brief and by the 2005 amendments to the rule itself—so long as it represents "a plausible construction of

the language of the actual regulation," *Ehlert v. United States,* 402 U.S. 99, 105, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971); *see also Northern Indiana Pub. Serv. Co. v. Porter,* 423 U.S. 12, 15, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975) (agency interpretation must "sensibly conform[ ] to the purpose and wording of the regulations").[7]

We pause briefly to explain the grounds for such deference, which greatly inform our decision here. Like the deference owed under *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to an agency's reasonable construction of a statute it administers, *Seminole Rock* deference is justified both by the agency's special expertise in the subject matter—and we have recently acknowledged that the SEC is "an agency uniquely experienced in confronting short-swing profiteering," *At Home,* 446 F.3d at 409—and by its relative political accountability. As the Court explained in *Chevron,* the resolution of ambiguities in legal texts will more often turn on policy preferences than parsing:

> Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to

---

cration is not necessary where, as here, the transaction arguably falls under one of the enumerated exemptions. In such a case, it may be possible to resolve the parties' claims solely on the ground that the Commission has exercised its delegated authority to exempt the transaction in question. Accordingly, we examine that possibility before proceeding, if necessary, to analyze the statutory language.

7. The views expressed in the Commission's *amicus* brief are the views of the Commission itself and not merely of the staff. *See* Brief of the Securities and Exchange Commission as *Amicus Curiae, At Home Corp. v. Cox Commc'ns, Inc.,* No. 05–115–CV, at 25–26 (2d Cir., Feb., 2006).

inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities. *Chevron,* 467 U.S. at 865–66, 104 S.Ct. 2778. Accordingly, the Court concluded, when Congress delegates policymaking authority to an agency for the purpose of administering a statute, such authority is presumed to include the interpretive discretion to resolve ambiguities in the statutory scheme. Following *Chevron,* the Court has supported *Seminole Rock* deference by a similar presumption: "Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). Agencies have an additional advantage in interpreting their own regulations, namely, that because the agency promulgates the regulations, it is in a superior position "to reconstruct the purpose of the regulations in question." *Id.* at 153, 111 S.Ct. 1171. Here, Congress explicitly delegated to the Commission the policymaking authority to exempt certain transactions "as not comprehended within

the purpose of this subsection," and took the further step of admonishing the courts that the statute "shall not be construed" otherwise. 15 U.S.C. § 78p(b).[8]

With these principles in mind, we turn to Rule 16b–7.

### B. *Rule 16b–7*

[6] We first note that under either version of Rule 16b–7, old or new, the conversion of Bessemer's preferred stock into common is exempt only if it can properly be called a "reclassification." Although the term "reclassification" has never been defined in the text of the rule, the release notes accompanying the 2005 amendments provide this explanation:

> [T]ransactions that are exempt as reclassifications generally include transactions in which the terms of the entire class or series are changed, or securities of the entire class or series are replaced with securities of a different class or series of securities of the company, and all holders of the reclassified class or series are entitled to receive the same form and amount of consideration per share.... These transactions ... do not involve a substantial change in the business owned, do not involve the holders' payment of consideration in addition to the reclassified class or series of securities, and have the same effect on all holders of the reclassified class or series....

2005 Release, 70 Fed.Reg. at 46085.

We agree with the Commission that the automatic conversion of Bessemer's preferred stock into common was "a classic

---

8. Bruh argues that because the Commission lacks the authority to bring its own enforcement actions pursuant to § 16(b), the usual rule of deference under *Seminole Rock* should not apply to the Commission's rules exempting transactions from § 16(b) liability. We held otherwise in *Levy v. Southbrook Int'l*

*Investments, Ltd.,* 263 F.3d at 16, and for the reasons just explained—Congress explicitly delegated policymaking authority to the Commission, which is "uniquely experienced in confronting short-swing profiteering," *At Home,* 446 F.3d at 409—we see no reason to retreat from that position.

reclassification .... encompass[ing] the simple exchange of one entire series of stock, VistaCare preferred stock, for another series of stock, VistaCare common stock, under circumstances where the holders of the preferred stock received the same form and amount of consideration per share." Bruh's only argument to the contrary is entirely unpersuasive.[9] He contends that Bessemer did not regard the conversion at issue as a reclassification because the Third Amended and Restated Certificate requires that reclassifications be approved by "the affirmative vote or written consent of ... two-thirds or more of the then outstanding shares of" preferred stock, and there is no evidence that such a vote ever took place after the requirement came into effect. But the very same Third Amended and Restated Certificate, which was itself "duly adopted by both the Board of Directors and the stockholders of the Corporation in accordance with the ... General Corporation Law of the State of Delaware," required, upon a Qualified IPO, that all Series A–1 preferred stock be *automatically* converted into common stock. Because the Third

Amended Certificate thus required no further approval for this transaction, the fact that no further approval was sought does not tend to show that Bessemer regarded the conversion as something other than a reclassification.

Our primary task, therefore, is to determine the extent to which the pre–2005 Rule 16b–7 exempted reclassifications. The rule then provided, in relevant part:

Mergers, reclassifications, and consolidations.

(a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:

(1) The acquisition of a security of a company, pursuant to a merger or consolidation, in exchange for a security of a company that before the merger or consolidation, owned 85 percent or more of either:

(i) The equity securities of all other companies involved in the merger or consolidation, or in the case of a consolidation, the resulting company; or

(ii) The combined assets of all the companies involved in the merger or consoli-

---

9. In his supplemental brief responding to the Commission's *amicus* filing, Bruh asserts two new arguments in this regard. These arguments, which are not based on any point raised by the Commission that Bessemer had not already advanced, come too late for our consideration. *See United States v. Yousef*, 327 F.3d 56, 115 (2d Cir.2003) (argument forfeited because not raised in initial appellate brief). In any event, we do not find them compelling. The first—that the Commission is required to borrow from state law in defining the term "reclassification," rather than adopting its own definition as it did in the 2005 Release, 70 Fed.Reg. at 46085—means nothing to this case unless Bruh is also correct in suggesting that the conversion at issue here failed to satisfy the requirements of shareholder assent under Delaware law. That suggestion is rejected, as we explain in the text: the Third Amended Certificate was itself adopted in accordance with Delaware

law, and the automatic conversion at issue here required no further approval. Bruh's second forfeited argument is based on his theory that the fixing of the IPO price, and thus the conversion ratio, constituted a "purchase" within the meaning of Rule 16b–6(a) by establishing a call equivalent position. The fixing of the purchase price, Bruh contends, should be considered separately from the conversion and can be matched independently against the May 2003 sale. The Commission disagrees, stating: "Both the December 17 fixing of the conversion price and the December 23 conversion of preferred into common are eligible for the Rule 16b–7 exemption, since they were both steps in the reclassification." We agree with the Commission. Indeed, it would make little sense to exempt the reclassification as a whole but impose separate liability for the component steps in that process.

dation, computed according to their book values before the merger or consolidation as determined by reference to their most recent available financial statements for a 12 month period before the merger or consolidation, or such shorter time as the company has been in existence. The Commission had amended Rule 16b–7 in 1991 to add the word "reclassifications" to the title, but not to the text, *see Ownership Reports and Trading By Officers, Directors and Principal Security Holders,* Exchange Act Release 28869, 56 Fed.Reg. 7242, 7273 (Feb. 21, 1991) ("1991 Release"), thus creating a glaring ambiguity: just how did the Commission mean for the rule to apply to reclassifications? The Commission amended Rule 16b–7 again in 2005, this time inserting "reclassification" throughout: each instance of "merger or consolidation" became "merger, reclassification or consolidation." The Commission contends that the 2005 amendments merely clarified its prior understanding of the rule, namely "that reclassifications are exempt under the same standards as mergers and consolidations." In other words, the Commission's answer is that the 1991 change in the title was meant to apply throughout the rule. That interpretation, argues the Commission, which is evidenced by both the 2005 amendments and its *amicus* brief in this case, is entitled to deference.

In assessing that argument, it is helpful to consider whether the Commission's current interpretation is consistent with how it has treated reclassifications under Rule 16b–7 in the past. *See Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988) (noting the relevance of "indications of the Secretary's intent at the time of the regulation's promulgation" in determining whether deference to administrative construction of regulation is appropriate). Rule 16b–7 was originally

promulgated in 1952, and it mentioned only "mergers and consolidations." *See Exemption of Certain Transaction from Section 16(b),* Exchange Act Release No. 4717, 17 Fed.Reg. 5501 (June 19, 1952, and corrected July 18, 1952 at 17 Fed.Reg. 6579). The courts were left to deal with reclassifications case-by-case, and no black-letter rule emerged; in determining whether a certain transaction could possibly give rise to the speculative abuse § 16(b) was aimed at preventing, courts weighed such factors as whether the defendant's proportionate interest in the issuer remained the same through the transaction, whether the transaction was disclosed to and approved by the shareholders, and whether all shareholders in the class were treated alike. *See Roberts v. Eaton,* 212 F.2d 82, 85 (2d Cir.1954) (collecting early cases).

In 1981, the Commission published a statement "setting forth the views of its Division of Corporation Finance on various interpretive questions regarding the rules promulgated under Sections 16(a) and 16(b)," *Interpretive Release on Rules Applicable to Insider Reporting and Trading,* Exchange Act Release No. 34–18114, 46 Fed.Reg. 48147 (Sept. 24, 1981) ("Interpretive Release"), in which it undertook to answer the following question: "Although not specifically mentioned, does Rule 16b–7 apply to transactions structured as (1) statutory exchanges; (2) liquidations; or (3) reclassifications?" *Id.* at 48176–77. With respect to reclassifications, the Commission staff sparsely responded that "Rule 16b–7 does not require that the security received in exchange be similar to that surrendered, and the rule can apply to transactions involving reclassifications." *Id.* at 48177. As Bruh points out, that response standing alone does not clear up the issue: Does "can apply" mean "applies," or in-

stead that the rule applies merely to some but not all reclassifications? Does "transactions involving reclassifications" mean simply "reclassifications," or does it import that a reclassification alone is somehow insufficient without a complementing step?

Taken in context, however, the reasoning the Commission advances here—that reclassifications are exempt where they are the substantive equivalent of a merger that would be exempt under the rule—comes into focus through the explanation it gave concerning transactions structured as a "statutory exchange," which immediately preceded the response concerning reclassifications in the Interpretive Release:

> The staff is of the view that, for purpose[s] of Rule 16b–7, a statutory exchange may be the substantive equivalent of a merger, consolidation or sale of assets. Therefore, the acquisition and disposition of stock in a statutory exchange would be exempt under Rule 16b–7, assuming all of the conditions of the rule are satisfied....
>
> [For example, suppose] Company B is a savings and loan association organized in the State of Virginia. Company A, a wholly-owned subsidiary of Company B, was incorporated under the laws of Virginia for the sole purpose of acquiring all the outstanding shares of capital stock of Company B. The purpose was

to create a holding company which would be able to acquire other savings and loan institutions in Virginia. Under Virginia law, Company B is not permitted to acquire stock of other savings and loan associations. As a result of the exchange, Company B became a wholly-owned subsidiary of Company A, and the former Company B shareholders became the owners of all the outstanding shares of Company A. This transaction was implemented pursuant to statutory procedures under Virginia law.... The acquisition by Company B stockholders of common stock of Company A and the corresponding disposition of the Company B stock in exchange fall within the terms of Rule 16b–7.

*Id.* at 48177. The Commission uses that same logic in its *amicus* brief in this case:

> In relevant respects a reclassification is little different from a merger exempted by Rule 16b–7. In both cases, all stock in a class is exchanged on terms that have been approved by the board and/or shareholders. The exchange occurs on a class-wide basis.... Indeed, the similarities between the two can be readily seen by the fact that a reclassification could also be effected by the issuer creating a new shell company, capitalizing it, merging the old company into the new, and then exchanging stock in the old company for stock in the new.[10]

10. Bruh argues, without any elaboration, that the Commission is wrong on this point because the "shell company" merger described would actually be a non-exempt liquidation, which the Commission explained in a second illustration following the Virginia example quote above:

> Illustration (2): Company X is a holding company whose principal asset is 100,-000 shares of Company Y common stock, roughly 6 percent of the total number of shares of such stock issued and outstanding. Company X proposes to liquidate so that its shareholders will hold the stock of

Company Y directly. Pursuant to the liquidation plan, shareholders of Company X will exchange their shares of Company X for those of Company Y on a pro rata basis.
> Interpretation: The acquisition and disposition of such shares is not exempt under Rule 16b–7. This transaction is not substantially similar to a merger or consolidation, nor does it meet the standards of paragraph (a) of the rule which provides that the acquisition and disposition of securities in connection with a merger or consolidation is exempt from

Thus, according to the Commission, the greater exemption for short-form mergers implicitly includes the lesser exemption for a reclassification that is a functional equivalent.

The Commission next addressed the issue in 1991, as we explained above, when it amended the title (and only the title) of Rule 16b–7 to include "reclassifications." 1991 Release, 56 Fed.Reg. at 7242, 7273. The Commission provided no explanation for the amendment except to note that it intended no "substantive" change to the rule. *Id* at 7261–62. It did include a chart updating the 1981 Interpretive Release where necessary to account for the 1991 amendments, but there was no change to the interpretation quoted above concerning reclassifications. *Id.*

In April 2002, a few months before the VistaCare IPO, the Commission issued a proposed rule amending Form 8–K, which sets forth reporting requirements similar to those under Section 16(a), 15 U.S.C. § 78p(a), for transactions involving officers and directors. The Commission proposed that "[a]cquisitions or dispositions pursuant to holding company formations and similar corporate reclassifications and consolidations" be exempt from reporting on the ground that "[t]hese are the transactions exempted from Section 16(b) short-swing profit recovery by Exchange Act Rule 16b–7." *Form 8–K Disclosure of Certain Management Transactions,* 67 Fed.Reg. 19914, 19919 & n. 56 (Apr. 23, 2002). That statement also lacks perfect

clarity, but it is certainly consistent with the position the Commission maintains here, namely, that Rule 16b–7 exempts reclassifications "under the same standards as mergers and consolidations."

Shortly thereafter—in fact, during the week between the fixing of VistaCare's IPO price and the closing—the Third Circuit decided *Levy v. Sterling Holding Company,* 314 F.3d 106 (3d Cir.2002). In that case, the plaintiff alleged that an automatic conversion of previously non-convertible preferred stock into common stock in preparation for an IPO constituted a non-exempt "purchase" under § 16(b). The district court dismissed the complaint on the ground that Rule 16b–7 provided an exemption, but the Third Circuit reversed. Proceeding "[i]n the absence of specific SEC guidance about which reclassifications are exempt from section 16(b) under Rule 16b–7," *id.* at 114, the court concluded that the transaction was not exempt, in part on the ground that "the risks and opportunities of shareholders of nonconvertible preferred stock ... are very different than the risks and opportunities of shareholders holding common stock," *id.* at 117.

Bruh urges us to adopt the Third Circuit's approach in *Levy* as the correct view of Rule 16b–7 prior to the 2005 amendments, and, given the factual similarity between the two cases, to decide this case in his favor. But even if we found *Levy* persuasive [11] and not distinguishable,[12] we

Section 16(b) where 85 percent or more of the assets or securities of all other companies involved in the transaction is owned by another party to the transaction.

1981 Release, 46 Fed.Reg. at 48177. It seems to us that the "shell company" merger the Commission suggests is nearly identical to the Virginia example and to be distinguished, for the reasons the Commission

gave, from the second example involving a liquidation.

11. The Commission argues convincingly that *Levy's* reliance on the different risks and opportunities associated with preferred and common shares is contrary to the SEC's 1981 interpretation that "Rule 16b–7 does not require that the security received in exchange be similar to that surrendered." Interpretive Release, 46 Fed.Reg. at 48177. Indeed, as

BRUH v. BESSEMER VENTURE PARTNERS III L.P.    213
Cite as 464 F.3d 202 (2nd Cir. 2006)

now have precisely what the Third Circuit lacked when conducting its inquiry in that case: the answer to whether "the conversion of the preferred stock ... [w]as the type of reclassification that the SEC would ... have intended to exempt by Rule 16b–7" *Levy,* 314 F.3d at 117. The Commission has stated, through both its *amicus* brief in this case and the 2005 amendments to Rule 16b–7, its view that a reclassification is exempt where it is the "substantive equivalent" of a merger that would be exempt. That view, we think, is plausible in light of the 1991 addition of "reclassifications" to the title of the rule and can reasonably be reconciled with the regulatory history of the Commission's treatment of reclassifications. As the Supreme Court has explained, "[w]here ... a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means." *Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 744 n. 3, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). We similarly conclude it is proper here to credit the Commission's current authoritative construction of its own regulation.

In so holding, we acknowledge that we could have proceeded differently in analyzing this case. A reasonable alternative approach would have been to ask first whether Rule 16b–7, as amended in 2005, exempts the conversion at issue (a question we would answer in the affirmative), and then proceed to determine whether the new rule has impermissible "retroac-

tive effect" within the meaning of *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."), and the cases following it explaining retroactivity doctrine. *See Landgraf v. USI Film Prod.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("[T]he court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."); *I.N.S. v. St. Cyr.,* 533 U.S. 289, 321, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *Arenas–Yepes v. Gonzales,* 421 F.3d 111, 117 (2d Cir.2005). We think the question of whether the current Rule 16b–7 would have retroactive effect if applied to the transaction at issue here turns primarily upon the answer we have given above, namely, that even applying the prior Rule 16b–7, according to the Commission's reasonable interpretation, the transaction is exempt. Needless to say, where applying the old rule produces the same result as would the new rule, there is no impermissible retroactive effect.

Finally, we disagree with Bruh's contention that this transaction did indeed present the danger of unfair use of insider information, and therefore the Commission

the Commission points out, "if the original security and the security for which it is being exchanged were precisely the same, there typically would be little need for a reclassification at all."

12. The Third Circuit was careful to point out that in *Levy,* "both the amendment of Fairchild's certificate of incorporation, which

made the conversion possible, and the actual conversion took place with the six-month period prior to the January 19, 2000 sales date," 314 F.3d at 117, whereas in this case, the Third Amended Certificate requiring the automatic reclassification was adopted nearly three years before the reclassification.

was without authority to exempt it. On that score, Bruh again faces an uphill battle, for as we have explained above, the Commission's interpretation of § 16(b), embodied in the amended Rule 16b–7, is entitled to *Chevron* deference so long as it represents a permissible understanding of Congress's intent.[13] Indeed, the implementation of Congress's objectives—and thus the decision as to whether certain transactions are exempt—falls primarily to the Commission, and not to the courts. The statute's prohibitions explicitly do not "cover any transactions *which the Commission by rules and regulations may exempt* as not comprehended within the purpose of this subsection." 15 U.S.C. § 78p(b) (emphasis added).

The purpose of § 16(b) was clearly articulated by Congress and fully supports the Commission's interpretation. Section 16(b) was enacted "[f]or the purpose of preventing the unfair use of information which may have been obtained by" insiders. *Id.* Bruh's theory of potential harm in this case is that Bessemer could have used its insider position to push the price of the IPO artificially downward. Whatever advantage Bessemer may have thus gained, however, it was not an *informational* advantage, which, as the statutory text makes clear, was the only type of insider advantage Congress intended § 16(b) to strip away. There is no allegation that any of the information in the various registration statements filed in connection with the VistaCare IPO was false, misleading, or incomplete in any way. And even if Bessemer did have access to information that the IPO would be

priced below an honest assessment of the company's value, Bessemer would not have been in a position to act on it in any way with respect to its preferred shares, since Bessemer had agreed in 1999 that those shares would be automatically converted to common stock no matter how high the IPO price was. Moreover, Bessemer's shares were converted along with the entire class of stock, and, as Judge Clark observed more than fifty years ago, it cannot "be gainsaid that like treatment of all stockholders will in most cases remove the possibility of abuse." *Roberts v. Eaton,* 212 F.2d 82, 84 (2d Cir.1954).

In sum, Bruh has not advanced any convincing theory of how the reclassification at issue gave Bessemer an opportunity to exploit insider information to speculative advantage sufficient to overcome the strong presumption of validity the Commission's exemptive rules enjoy.

## CONCLUSION

For the reasons set forth above, we conclude the reclassification of Bessemer's preferred stock into common stock in preparation for the VistaCare IPO was exempt from § 16(b) liability under Rule 16b–7, and that such an exemption falls safely within the Commission's delegated authority. The judgment of the district court is accordingly AFFIRMED.



---

**13.** In *At Home,* we reserved the question of whether *Chevron* deference was due an interpretation of § 16(b) adopted by the Commission for the first time in an *amicus* brief, that is, on an issue as to which the Commission had never exercised its rulemaking authority. 446 F.3d at 409 & n. 5. We need not decide

that question today because the Commission's position in this case was adopted not only in an *amicus* brief, but also "by rules and regulations," 15 U.S.C. § 78p(b), the very procedure Congress prescribed in delegating exemptive authority to the Commission.